Doerfer, J.
This is a dispute between the majority shareholder and the minority shareholder of a close corporation. Both the corporation, Alder Food Distributors, Inc. (“Alder” or the “Company”) and its majority shareholder, Paul M. Keating, Sr. (“Paul Sr.”) are requesting injunctive relief against Alder’s minority shareholder Paul M. Keating, Jr. (“Paul Jr.”), a former Alder employee John Whouley (“Whouley") and Elite Food Company, Inc. (“Elite”). Specifically, Alder and Paul Sr. seek to enjoin Paul Jr., Whouley and Elite from both doing business with any entity that was a supplier of Alder as of April 13, 2000 and from engaging in the business of buying, selling and distributing certain types of food products to United States military commissaries.[1] Paul Jr. in turn seeks to enjoin Alder and Paul Sr. and their agents from either taking any action that threaten, intimidate or coerce any entity involved in the food industry from dealing with Paul Jr. and/or Elite. Paul Jr. further requests that the court enjoin Alder, Paul Sr. and their agents, from maliciously disparaging, slandering or otherwise defaming Paul Jr. and/or Elite. By agreement the claims of both parties were consolidated before the court. After hearing and for the reasons stated below, the cross motions for preliminary injunction are DENIED.
BACKGROUND
The court summarizes below the background facts underlying the parties’ cross motions for injunctive relief.[2] The parties have submitted lengthy memoranda to the court containing detailed recitations and discussions of the various factual contentions and issues.
Alder is a close corporation engaged in the business of buying specific food brands and products from their respective manufacturers and then shipping and reselling them to United States military commissaries worldwide. In order to sell these products to commissaries, Alder has entered into a contract with the Defense Commissary Agency (“DeCA”). Under the terms of this contract, DeCA allows Alder to distribute a limited number of specific food products and brands for sale in commissaries.[3] Alder must act as the exclusive distributor of these specific products and brands. Alder hires brokers to represent its brand lines in particular geographic regions. As a matter of long-standing business policy, Alder does not hire brokers who represent product lines that compete with brands distributed by the Company.
Paul Sr. founded Alder in 1986 and currently serves as its president. He is also one of the Company’s two directors, its majority shareholder and owns 51% of Alder’s stock. In 1988, Paul Jr. joined Alder at the urging of his father Paul Sr. In 1990, Paul Sr. elected Paul Jr. as Alder’s other director and eventually appointed his son vice president of sales. Over the past several years, Paul Sr. has scaled back his involvement with Alder and as a result Paul Jr. took increasing control over the Company’s operations. In 1997, Paul Jr. received 49% of Alder stocks and assumed control over the day-to-day operation of the Company. That same year Whouley, a boyhood friend of Paul Jr. was hired to be Alder’s director of finance. In August of 1999, Dustin Whitney another acquaintance of Paul Jr. was hired to be Alder’s sales and distribution manager. During the twelve years that Paul Jr. worked at Alder he contributed to the Company’s economic *90 success and growth, particularly in area of computerization and data management.
Sometime in 1998, Paul Sr. began serious discussions with his son concerning the issue of Paul Jr. acquiring the controlling interest in Alder. In September of 1998, Paul Jr. asked his sister Michelle Keating (“Michelle”) to join Alder as vice president of marketing, because he anticipated that he would need Michelle’s help in financing his acquisition ofPaul Sr.’s stock. It was understood at the time Michelle joined Alder that she would eventually received an equity interest in the Company. In September of 1999, Paul Sr. offered to sell his interest to both Paul Jr. and Michelle for four million dollars ($4,000,000) as well as air travel and car expenses for ten years. Paul Jr. was initially opposed to Michelle receiving a 50% ownership interest in the Company, however, in January of 2000, he accepted a proposal offered by a mediator which contained a 50 / 50 stock split between himself and Michelle. The parties however never agreed to the terms of a buyout of Paul Sr.’s stock.
On February 11, 2000, Paul Jr. had an encounter with an Alder employee Donna Murphy (“Murphy”), concerning an inventory control mistake. The parties dispute the nature of this encounter between Paul Jr. and Murphy. Alder and Paul Sr. contend that Paul Jr. engaged in a foul-mouthed tirade which led Murphy to inform Michelle that she was leaving the Company as a result of Paul Jr.’s treatment. Paul Jr. asserts that he reasonably reprimanded Murphy for a costly mistake on her part. It is undisputed, however, that after learning of the incident from Murphy, on February 15, 2000, Michelle subsequently informed the Company’s employees that Paul Jr. would be “taking time off.” Michelle, then telephoned Paul Sr. to discuss the incident and recommend that Paul Jr. “take time off.”
On February 17, 2000, Paul Sr. sent Paul Jr. a letter suspending him with pay for a period of thirty days. Paul Sr. stated in his letter that Paul Jr. was to have no contact with the business operations of Alder during the suspension period. Paul Sr. expressed his hope that for the good of both Paul Jr. and the future of Alder, his son engage in some self reflection concerning his recent actions and determine how to grow personally and professionally. The letter closed as follows.
If for any reason you are unwilling to accept these conditions immediately or, if after thirty days you are not ready to resume your role as Vice President in our family company further actions will have to be considered. Prior to your return to Alder Foods you must review your future plans with me.
On February 28, 2000, Paul Jr. sent Paul Sr. a written response to the February 17, 2000 suspension letter. In this response letter, Paul Jr. indicated his belief that the incident between himself and Murphy had been “grossly exaggerated,” and that his relationship with Alder’s employees was one of “compassion and respect.” Paul Jr. also stated his willingness to adhere to the “business principles” of Paul Sr. Paul Jr. closed this letter with a request that Paul Sr. call him to “discuss moving forward.”
On March 14, 2000 Paul Sr. sent a letter to Paul Jr. informing him that as a result of a refusal to either acknowledge or address his treatment of Alder employees, a further suspension without pay was being imposed on Paul Jr. Paul Sr. further stated that the suspension would be lifted only if Paul Jr. complied with three specific conditions. First, Paul Jr. had to participate in a training course to improve his employee management skills. Second, Paul Jr. had to meet with Paul Sr. to improve their working relationship as president and vice president of Alder. Lastly, Paul Jr. was required to meet with Michelle to resolve their working relationship.
Paul Jr. did not agree to abide by the conditions set forth by Paul Sr. as the prerequisites to Paul Jr.’s return to work. Instead, Paul Jr. offered a counter proposal that he, Paul Sr. and Michelle all participate in management training courses and that the Board of Directors meet formally to discuss the relationship between himself and Paul Sr. It is also undisputed that Paul Jr. at some point offered to travel to Florida to met with Paul Sr. informally in order to restore their relations.
Paul Sr. did not agree to these proposals and made no counter proposals. Instead, he continued Paul Jr.’s indefinite suspension without pay.
On April 13, 2000, Paul Jr. resigned as a director of Alder. Four days later on April 17, 2000, Whouley resigned from Alder and Whitney also submitted his resignation from the Company on April 24, 2000. On or about April 28, 2000, Paul Jr. informed three of Alder’s suppliers (Ken’s Foods, Integrated Brands and Bel/Kaukana) that he was no longer working for Alder and had formed Elite. These three suppliers have since transferred their business from Alder to Elite.
It is undisputed that in at least one case Alder has informed food brokers that if they deal with Elite they will be unable to do further business with Alder. Alder in fact asserts that it has the right to require this type of exclusive relationship with the brokers with which it conducts business.
DISCUSSION
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). Under Massachusetts law, a party seeking a preliminary injunction pursuant to Mass.R.Civ.P. 65(b) must on the basis of such an abbreviated record “show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits.” Id. In discussing the factors a judge must consider in deciding whether or not to *91 grant a preliminary injunction, the Massachusetts Supreme Judicial has stated as follows:
Therefore, when asked to grant a preliminary injunction, a court initially evaluates in combination the moving party’s claim of injury and chance of success on the merits. If the judge is convinced that the failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of a party’s chance of success on the merits. Only where the balance between the risks cuts in favor of the moving party may a preliminary injunction properly issue. Id. at 617.
This court will therefore, first consider in turn each party’s chance of success on the merits of their various claims. The court will then weigh the amount of irreparable harm each party may suffer if injunctive relief is not granted in light of their chances of success on the merits.
1. Alder and Paul Sr.’s Claim for Breach of Fiduciary Duty
Alder and Paul Sr. assert that as a 49% shareholder in Alder, Paul Jr. has breached his fiduciary duty to the Company by competing in the same line of business as Alder and by attempting to transfer Alder’s specific business to Elite. Paul Jr. contends in opposition to this claim, however, that he was wrongfully terminated as a director and employee of Alder and consequently owes no fiduciary duty to the company despite his continuing status as a minority shareholder. In support of this assertion, Paul Jr. argues that the fiduciary duties of the shareholder/director/employee of a close corporation cease once that shareholder has been wrongfully terminated from employment with the corporation, citing J Bar H, Inc. v. Harger, 822 P.2d 849 (Wyo. 1991), and Voss Engineering, Inc. v. Voss Industries, Inc., 134 Ill.App.3d. 632 (1985). During oral argument, Alder and Paul Sr. conceded that if indeed they had wrongfully terminated Paul Jr. as an employee, he would not in fact owe the Company any continuing fiduciary duty even though he remains as a minority shareholder.[4]
Alder and Paul Sr. assert, however, that they did not wrongfully terminate Paul Jr. and that he owes a continuing fiduciary duty to the Company which has been breached. Alder and Paul Sr. maintain that their actions in first imposing a thirty-day suspension and subsequently a continuing suspension until Paul Jr. complied with certain conditions, were undertaken to accomplish the legitimate business purpose of ending Paul Jr.’s mistreatment of employees. They further contend that these two suspension were both reasonable and well within the wide management discretion granted to majority shareholders of close corporations under Massachusetts law. The court, however, based on the facts before it, is not persuaded that Alder and Paul Sr. have a likelihood of succeeding on the merits of this claim.
Wilkes v. Springside Nursing Home Inc., 370 Mass. 842 (1976), establishes the legal standard to be applied in evaluating the proper exercise of the management discretion given to majority shareholders of close corporations:
Therefore when minority stockholders in a closed corporation bring suit against the majority alleging a breach of the strict good-faith duty owed them by the majority, we must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action. (Citations omitted.) In asking this question, we acknowledge the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. It must have a large measure of discretion for example, in declaring or withholding dividends, deciding whether to merge or consolidate, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees.
When an asserted business purpose for their action is advanced by the majority however, we think it is open to minority stockholders to demonstrate that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interest. (Citations omitted.) If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative. Id. at 851-52.
Paul Sr.’s initial action in suspending Paul Jr. for thirty days with pay was probably a reasonable course of action designed to accomplish the legitimate business purpose of ending Paul Jr.’s alleged mistreatment of employees. The conditions imposed on Paul Jr. as part of this suspension, namely that he take time to reflect on his personal and professional performance and meet with Paul Sr. to discuss his future with Alder were also reasonable.
However Paul Sr.’s further inflexible adherence to his further decision to indefinitely suspend Paul Jr. without pay until three specific conditions were met was far too harmful a means of achieving a legitimate business objective. Paul Sr. in his indefinite suspension letter of March 14, 2000, expressly states that he is taking this action as a result of Paul Jr.’s refusal to either acknowledge or address his employee management problems. Paul Sr. cites as a proof of this refusal Paul Jr.’s February 28, 2000 letter to him in response to the initial thirty-day suspension. The court has carefully examined the February 28, 2000 letter and concludes that Paul Jr.’s was not in fact defiantly *92 refusing to accept the legitimate business objective behind Paul Sr.’s initial suspension of him. While Paul Jr. does in the letter indicate his belief that he did not mistreat Murphy, he expressly states his willingness to adhere and respect Paul Sr.’s business principles. Paul Jr. also asks for the opportunity to abide by Paul Sr.’s condition that they discuss Paul Jr.’s future.
Paul Sr.’s inflexible decision to treat the February 28, 2000 letter as an act of open defiance on Paul Jr.’s part justifying an indefinite suspension was not reasonable and, in the light of Paul Jr.’s offer to address the problem was the course of action most harmful to Paul Jr.’s interests as a minority shareholder.
Paul Jr. offered to abide by a modified set of conditions also cited above in response to the three conditions set by Paul Sr. relative to Paul Jr.’s reinstatement with back pay. This undertaking by Paul Jr. to abide by a modification of Paul Sr.’s three conditions was not a refusal to accept the legitimate objectives of Paul Sr., but rather was a good-faith attempt to resolve the differences between the majority and minority shareholders. Paul Jr. did not in offering this counter-proposal deny that he needed management training or that he needed to improve his working relationship with both Paul Sr. and Michelle. Rather, Paul Jr. indicated a belief that there was fault on all sides and that all parties needed to engage in some type of training and mediation to resolve their differences and reestablish a working relationship.
In the context of this family business involving a father and two adult children this was a reasonable proposal.
Paul Sr.’s refusal to consider Paul Jr.’s counter proposal and his refusal to negotiate conditions acceptable to both sides was unreasonable. In suspending Paul Jr. indefinitely and refusing to negotiate mutually acceptable conditions for ending that suspension, Paul Sr. disregarded the harm to the interests of a minority shareholder even though his overall purposes may have been legitimately directed to business of the company.[5] Thus the court does not find that Alder and Paul Sr. are likely to prevail on their claim that Paul Jr. breached a fiduciary duty.[6]
Alder and Paul Sr. also claim that Whouley breached a fiduciary duty he owed to Alder because of his former position as the Company’s Director of Finance. Under Massachusetts law, high-level employees do indeed owe a fiduciary duty to their employers. Chelsea Industries Inc v. Gaffney, 389 Mass. 1, 11, (1983) (“Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employers”). The existence of this duty would have precluded Whouley during the course of his employment with Alder from actively competing with the Company, soliciting Alder’s customers or soliciting fellow employees to leave Alder’s employ and compete with the Company. See Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172-73 (1991). This fiduciary duty would also prohibit Whouley from misappropriating Alder’s trade secrets either during the course of or after his employment with the Company. Id. While the court views with some skepticism the contention made by Paul Jr. that Whouley is not now actively working at Elite, the court does not find that during the course or after his term of employment with Alder, Whouley has engaged in any conduct which breached a fiduciary duty owed to the Company.[7]
2. Alder and Paul Sr.’s Claim for Misappropriation of Trade Secrets
Alder and Paul Sr. also bring a claim against Paul Jr., Whouley, Whitney and Elite for misappropriation of trade secrets. Alder and Paul Sr. contend that during Paul Jr.’s time with the Company he acquired confidential information concerning Alder’s business practices and strategies which he is now using to .compete Alder. The Company and Paul Sr. further assert that in his capacity Director of Finance, Whouley, also acquired confidential information that he is using to assist Elite.
Under Massachusetts law, in order to prevail on their claim of trade-secret misappropriation, Alder and Paul Sr. must prove the following three elements: that they possessed trade secrets; that they took reasonable steps to preserve the secrecy of the trade secrets and that the defendants breach their duty not to disclose or use the trade secrets. See Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937, 939 (1984). Given the elements that must be proven to sustain a misappropriation of trade secrets claim, the court is not persuaded that there is a likelihood that Alder and Paul Sr. will prevail on such a claim.
“The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in a industry cannot be appropriated by one as his secret.” J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970). The specific subject matters of information which Alder and Paul Sr. contend that Paul Jr. and Whouley possess are the details of the Company’s contracts with its suppliers, and knowledge of other participants in the industry, the Company’s pricing, costs, and profit information, its compensation to its employees, and the specifications of its customized computer system. On the evidence before the court it is not likely that Alder will prevail on its claim that the information in question should be protected as trade secrets.
There are six factors which are relevant to the determination as to whether information is “in fact and in law confidential.” Jet Spray Cooler Inc. v. Crampton 361 Mass. 835, 840 (1972).
The first factor is the extent to which the information is known outside the business. Id. The facts in the abbreviated record before the court demonstrate that much of the information Alder and Paul Sr. claim is confidential (e.g., the prices paid by the government *93 for the products it purchased) was in fact either shared by the Company with others engaged in the same business field or subject to the Freedom of Information Act since Alder conducted its business under agreements with DeCA which is a federal agency.
The second factor is the extent to which the information is known by employees and others involved in the business. Id. Again, the evidence in the record indicates that Alder regularly provided its employees with access to a wide array of information about the Company’s suppliers, pricing policies and sales.
The third factor is the extent of the measures undertaken by an employer to protect the secrecy of the information. Id. The evidence before the court shows that Alder and Paul Sr. did not take extensive steps to safeguard the information they now claim is confidential. Only two of the Alder’s eighteen employees for example had confidentially agreements with the Company. The record also indicates that Alder employed no procedures for identifying certain documents as confidential or for directing employee as to how to deal with confidential information.
The fourth factor cited by the Supreme Judicial Court in Jet Spray is the value of the information to the employer. Id. It is clear from the record and as a matter of common sense that information concerning Alder’s dealings with suppliers, sales, pricing, computer system and overall business strategies was valuable to the Company. The evidence in the record, however, demonstrates that the information concerning Alder’s pricing and sales is constantly changing and therefore any information concerning these Subjects possessed by Paul Jr. and Whouley may now be or soon will be outdated. Thus the value of this information to not only Alder and Paul Sr. but to Paul Jr. as well is impacted by its changing nature.
The next relevant factor to be considered in determining the confidential nature of information is the amount of effort or money expended by the employer in developing the information. Id. There is little evidence in the record before the court concerning the efforts undertaken or costs incurred by either Alder or Paul Sr. in developing the information they believe to be confidential. The question of Alder’s computer system is in fact the only one on which any significant evidence was offered. The record indicates that Alder and in particular Paul Jr. spend many months customizing a computer software system for the Company at a cost of approximately $300,000 to a vendor.
The evidence is not persuasive that this customization represented anything more than the application of generalized knowledge about readily available business management software to the particular business of Alder.
The final factor to be considered in analyzing the confidentially of information is the ease or difficulty with which the information could be properly acquired or duplicated by others. Id. There is significant evidence in the record relative to this question. As noted above the record indicates that Paul Jr. and others in the food industry could readily acquire and duplicate information concerning the identity of Alder’s suppliers, and well as its sales and pricing policies either by freedom of information requests or by just being part of the same general business.
The facts presented to the court also demonstrate that the information Paul Jr. possesses about both Alder’s operations and its dealings with suppliers was acquired because he was a long-time high-level manger of the company. But this type of “remembered information” of a company’s former president/director/manager as to company’s “prices, the frequency of service, and the specific needs and business habits of particular customers was held to be not confidential” in American Window Cleaning Co., v. Cohen, 343 Mass. 195, 199 (1961), and cases cited. The evidence also suggests relative to the computer software utilized by Alder, that this type of software is widely available within the food industry and could be readily purchased and customized.
On the evidence in the record, applying the six factors under Jet Spray, Alder is not likely to prevail .on its claim to prevent Paul Jr. and his company from using the information it seeks to protect as trade secrets.
3. Alder and Paul Sr.’s Claim for Interference with Contractual and/or Advantageous Business Relations
Alder and Paul Sr. contend that Paul Jr., Whouley and Elite have used improper means to interfere with the Company’s relationships with its suppliers and brokers. To prevail on this claim, Alder and Paul Sr. must prove three elements: 1) the existence of a business relationship or prospective contractual relationship with economic benefit: 2) Paul Jr., Whouley and Elite’s knowledge of this relationship and their intentional interference with this relationship through improper means or motives; and 3) Alder’s loss of an advantage as a result of this improper conduct. General Electric Co. v. Lyon, 894 F.Sup. 544, 550 (D.Mass.1995)
Alder and Paul Sr. enjoy an economically beneficial relationship with their suppliers and brokers. Paul Jr. and Elite are aware of this relationship and as result of their interference with Alder’s suppliers and brokers, the Company lost two suppliers- Alder and Paul Sr. contend that this interference was improper as it arose out of both Paul Jr. and Whouley’s breach of their fiduciary duties and the misappropriation of trade secrets by Paul Jr., Whouley and Elite. The court has found above that there was no such breach of fiduciary duties or misappropriation of trade secrets by Paul Jr., Whouley or Elite. Thus, Alder and Paul Sr. have failed to make the prerequisite showing of an improper means or motive necessary to prevail on their claim for intentional interference with a contractual or advantageous relationship.
*94 4.Alder and Paul Sr.’s 93A Claim
Finally, Alder and Paul Sr. bring a claim against Paul Jr. and Elite for unfair and deceptive trade practices in violation of G.L.c. 93A. The court having found no breach of fiduciary duties, misappropriation of trade secrets or intentional interference with advantageous relations by either Paul Jr. or Elite further finds that they did not engage in any unfair or deceptive trade practices.
5.Paul Jr.’s Claims for Interference with an Advantageous Business Relationship and Defamation
Paul Jr. also brings a claim against both Alder and Paul Sr. for intentional interference with the advantageous business relationship he possesses with certain food suppliers and brokers. In order to prevail on his claim for intentionally interference, Paul Jr. must prove the same three elements cited by the court above in discussing the similar claim brought by Alder and Paul Sr. Specifically, Paul Jr. contends that Alder and Paul Sr. have contacted certain brokers and suppliers with whom Paul Jr. has an economically beneficial relationship and threatened to end Alder’s business dealing with these suppliers and brokers if they conduct business with Paul Jr. Alder has a longstanding policy of requiring as much exclusivity on the part of the brokers it retains as possible. There is nothing wrongful in Alder holding such a company policy. There is also nothing wrongful in Alder requiring an exclusive relationship on the part of the brokers and suppliers with whom it does business. See Holmes Products Corp. v. Dana Lighting Inc., 958 F.Sup. 27, 35-36 (D. Mass. 1997); Winter Hill Frozen Food Services v. Haagen Dazs, 691 F.Sup. 539, 548 (D. Mass. 1988); Moffat v. Lane Co., 595 F.Sup. 43, 49 (D. Mass. 1984). The fact therefore, that Alder and Paul Sr. are asking certain suppliers and brokers to choose between with Elite or Alder, does not constitute the use of improper motives or means to interfere with the advantageous business relationships of Paul Jr. Thus, Paul Jr. has failed to make the prerequisite showing of improper motive or means on the part of another, necessary to prevail on his claim.
Paul Jr. further contends that Paul Sr. is maliciously and intentionally disparaging his reputation among mutual business associates. Paul Jr. specifically cites as actionable as slander Paul Sr.’s statement to the effect that Paul Jr. is an “ungrateful spoiled brat.” Paul Sr. contends that such a statement is not actionable as it is simply one of opinion.
“The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion.” King v. Globe Newspaper Co., 400 Mass. 705, 709 (1987). A statement to the effect that someone is an “ungrateful spoiled brat” is so completely subjective as to render it unambiguously an opinion. As such it is not actionable as defamatory. “Statements of fact may expose their authors or publishers to liability for defamation, but statements of pure opinion may not. Statements of pure opinion are constitutionally protected.” Id. at 708.
5. Paul Jr.’s 93A Claim
Paul Jr. also brings a claim against Alder and Paul Sr. for unfair and deceptive trade practices in violation of G.L. 93A. The court having found no intentional interference with advantageous relations by neither Alder nor Paul Sr. and that Paul Sr. did not slander Paul Jr., further finds that Alder and Paul Sr. did not engage in any unfair or deceptive trade practices.
6.Irreparable Harm and Balance of Harm
Based on the record before it, the court has determined that neither party will succeed on the merits of the claims upon which they seek injunctive relief. The court must now consider the risk of harm both sides will suffer if injunctive relief is denied in light of their chances of success on the merits. Packaging Industries, 380 Mass. at 617.
If Alder and Paul Sr. are denied injunctive relief they will continue to face active and effective competition concerning their product lines, suppliers and brokers from Paul Jr. and Elite. Likewise, if Paul Jr. and Elite are denied injunctive relief they will face the same type of competition from Alder as Elite’s attempt to expand its line of suppliers and brokers. Therefore, in the absence of injunctive relief each side will suffer the harm of continued competition from the other. The court has found, however, while the continuing competition between the two business has no doubt been aggressive and extremely unpleasant, it has to this point been lawful competition. No legal harm has been suffered by either party in this action simply because they must compete with a determined and experienced business foe. Thus, the court finds that the parties’ lack of success on the merits of their claims is coupled with no risk of irreparable harm to either party in the absence of injunctive relief. Therefore neither party is entitled to such injunctive relief.
ORDER
For the reasons stated above, the parties’ cross motions for preliminary injunction are DENIED.

 Alder and Paul Sr. seek to enjoin Keating Jr., Whouley and Elite from selling to military commissaries any fluid milk products, yogurt, cheese, creams, nondairy coffee creamer, iced tea, frozen fish and shrimp, salad dressing and frozen fruit bars.

In deciding a motion for preliminary injunction a court must necessarily rely on a abbreviated presentation of facts and law. See Packaging Industries Group. Inc., v. Cheney, 380 Mass. 609, 616 (1980). No testimony was taken by the court in this matter. Consequently, the facts are determined for purposes of these cross motions for preliminary injunction based on affidavits, deposition transcripts and documents. In many instances the facts are not disputed, but reasonable inferences may vary. In other instances there is a conflict in the evidence and the court has applied its sound discretion in determining the facts relevant to its decision on the cross motions for preliminary injunction.

The specific brands and products which DeCA allows Alder to sell are: Nestle Coffeemate; Nestle Quik: Nestle Ice Tea; White Wave Silk soy milk; Lactaid milk; Land-o-Lakes sour cream; Land-o-Lake creams; Bel/Kaukauna specialty cheese; rainbow brand frozen shrimp and seafood; Tropicana Fruit Bars and Fruit Stix; USA fresh milk and other fluid milk products; and Ken’s salad dressing.

They would continue to press their claims relating to trade secrets discussed infra, even if their actions regarding Paul Jr. amounted to a wrongful termination.

The court need not evaluate the claims of Paul Jr. at this time that his father and sister were using the incident in question as cover for a bad-faith attempt to oust him.

Paul Jr. in count one of his complaint brings a claim against Alder and Paul Sr. for Minority Freeze-Out/Breach of Fiduciary Duty. Given the court’s findings concerning the actions of Alder and Paul Sr., the court further finds that Paul Jr. would succeed on the merits of this claim. Paul Jr. does not. however, seek injunctive relief from Alder’s and Paul Sr.’s breach of fiduciary duty. Rather as will be discussed below Paul Jr.’s basis for injunctive relief is his claim that Alder and Paul Sr. are intentionally interfering in his advantageous business relations.

See below for the court’s discussion relating specifically to the misappropriation of the trade secrets claim against Paul Jr., Whouley and Elite.