**HARVARD APPARATUS, INC., Plaintiff,**

v.

**Barry COWEN, d/b/a Yale Apparatus, Defendant.**

**No. Civ.A. 98–11124–MBB.**

United States District Court, D. Massachusetts.

Jan. 23, 2001.

Franklin H. Levy, Abrams, Roberts, Klickstein & Levy, Boston, MA, for Harvard Apparatus, Inc., plaintiff.

Edward Rudnitsky, Watertown, MA, for Barry Cowen dba Yale Apparatus, defendant.

Anthony A. Bongiorno, Christopher R. Bush, McDermott, Will & Emory, Boston, MA, for Kent Scientific Corporation, defendant.

### *MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 70); DEFENDANT BARRY COWEN'S MOTION TO STRIKE (DOCKET ENTRY # 71)*

BOWLER, United States Magistrate Judge.

Plaintiff Harvard Apparatus, Inc. ("plaintiff" or "New Harvard") filed this copyright and trademark infringement action alleging that defendant Barry Cowen ("Cowen"), a former employee of a predecessor corporation, manufactured and offered for sale certain programmable syringe pumps under the name of the Yale Model YA–12 ("the Yale pump") which feature the trade dress of certain Harvard pumps and misappropriate the source code of such pumps. Cowen moves for summary judgment and also moves to strike the use of the words "suspicious" and "influenced" from the report of plaintiff's experts, David A. Vogel and David S. Bernazzani ("plaintiff's experts"). (Docket Entry ## 70 & 71). After conducting a

hearing, this court took the motions (Docket Entry ## 70 & 71) under advisement.

## PROCEDURAL BACKGROUND AND STANDARD OF REVIEW

The verified complaint divides itself into five counts but alleges multiple causes of action in various counts. These causes of action are as follows: (1) trade dress infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("section 43(a)"); (2) violation of the Massachusetts antidilution statute, Massachusetts General Laws chapter 110B ("chapter 110B"); (3) violation of the Massachusetts consumer protection statute, Massachusetts General Laws chapter 93A ("chapter 93A"); (4) copyright infringement in violation of 17 U.S.C. § 101; (5) misappropriation of a trade secret, i.e., the source code for the Harvard pumps, in violation of Massachusetts General Laws chapter 93, sections 42 and 42A ("section 42" or "section 42A") (Count IV); (6) theft of a trade secret in violation of 18 U.S.C. § 1832(a) ("section 1832"); (7) misappropriation of confidential and proprietary business information, i.e., the source code for the Harvard pumps, under Massachusetts common law (Count V); (8) misappropriation of a trade secret under Massachusetts common law (Count V); and (9) common law conversion. (Docket Entry # 52).

■ Although the fourth and ninth causes of action technically remain in this action, as previously noted (Docket Entry # 68), they are weak and could not support a preliminary injunction. With respect to the copyright infringement claim of the source code, registration is a prerequisite to suit, 17 U.S.C. § 411; *Geoscan, Inc. of*

Texas v. Geotrace Technologies, Inc., 226 F.3d 387, 392 (5th Cir.2000); Brewer–Giorgio v. Producers Video, Inc., 216 F.3d 1281, 1285 (11th Cir.2000), and the source code remains unregistered (Docket Entry # 66, Ex. A).[1] With respect to the conversion claim, this court previously stated that it could not locate "any authority to suggest that Massachusetts has expanded the common law tort of conversion beyond its traditional application to chattels." (Docket Entry # 68, n. 3). Plaintiff is therefore ordered to advise this court on or before February 8, 2001, whether it wishes to press these causes of action. If not, plaintiff should file a voluntary dismissal of the causes of action or a stipulation of dismissal on or before February 8, 2001. If plaintiff wishes to proceed with one or both causes of action, it is ordered to provide this court with legal authority to maintain the cause[s] of action on or before February 8, 2001.

As to the sixth cause of action, section 1832 is a criminal statute which prescribes the theft of trade secrets. Violation of the statute is punishable by a fine or incarceration. If plaintiff wishes to proceed with this cause of action, it should provide this court with legal authority of the ability to maintain a private, civil cause of action under section 1832 on or before February 8, 2001. If plaintiff does not wish to proceed with this cause of action, it should file a voluntary dismissal of the cause of action or a stipulation of dismissal on or before February 8, 2001.

Turning to the summary judgment motion, with the exception of noting the withdrawal of the copyright infringement allegation, the supporting memorandum only addresses the first, seventh and eighth causes of action.[2] Hence, as the movant, Cowen fails in his initial summary judg-

---

1. Cowen withdrew a motion to dismiss the copyright claim (Docket Entry # 62) in open court on March 8, 2000. Although plaintiff does not plan to register the source code (Docket Entry # 66, Ex. A) and Cowen notes that plaintiff has withdrawn this "allegation" (Docket Entry # 74), technically, the claim

remains in the case. The parties never filed a stipulation of dismissal of the claim as instructed by this court on March 8, 2000.

2. The motion itself requests dismissal of the entire complaint, costs and such other relief as this court deems appropriate.

ment burden as to the chapter 110B, the chapter 93A and the section 42 [3] causes of action. These causes of action therefore remain in the case and, at this point in time, may proceed to trial.

Summary judgment as to the trade dress infringement claim in violation of section 43A and the misappropriation of trade secret and proprietary business information claims under Massachusetts common law "is appropriate where there are no genuine disputes as to material facts and the moving party is entitled to judgment as a matter of law." *Saenger Organization v. Nationwide Insurance Associates,* 119 F.3d 55, 57 (1st Cir.1997). In this respect, a "genuine" issue exists where "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). " '[M]aterial' means that a contested issue of fact has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Smith v. F.W. Morse &*

*Company, Inc.,* 76 F.3d 413, 428 (1st Cir. 1996).

The moving party bears the initial burden of informing the "court of the basis for the motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997). "As to issues on which the summary judgment target bears the ultimate burden of proof, she [or it] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995); *accord DeNovellis v. Shalala,* 124 F.3d at 306. Factual disputes are resolved in favor of plaintiff, the non-moving party. *See Saenger Organization v. Nationwide Insurance Associates,* 119 F.3d at 56. More specifically, "credibility determinations may not be made, and the evidence must be viewed favorably to the non-movant, with doubts resolved and reasonable inferences drawn in the non-movant's favor." *Wanless v. Fedders Corporation,* 145 F.3d 1461, 1463 (Fed.Cir.1998).

---

**3.** The supporting memorandum addresses the trade dress infringement cause of action in part II of the argument section and the trade secret claim in part III of the argument section. In seeking summary judgment, however, Cowen does not distinguish between the statutory cause of action for misappropriation of a trade secret under section 42 (Count IV) and the common law cause of action (Count V). Cowen's supporting memorandum primarily relies on case law involving the common law cause of action. In fact, nowhere does Cowen cite to section 42 or to section 42A, which provides for injunctive relief. Although Cowen cites to Count IV, wherein plaintiff brings the section 42 cause of action, he does so only for purposes of noting that Cowen raises a cause of action for the use of proprietary or confidential information as well as for the misappropriation of a trade secret. Accordingly, lacking a developed argument with respect to the statutory cause of action under section 42, Cowen fails to meet his initial summary judgment burden. The section 42 cause of action may therefore proceed to trial at this point in time.

In any event, except for the allowance of double damages and injunctive relief to an employer of a former employee, section 42, which incorporates the definition of a trade secret found in section 30(4) of Massachusetts General Laws chapter 260 ("section 30(4)"), and section 42A do not change the ambit of trade secret protection under the common law. *See Chomerics, Inc. v. Ehrreich,* 12 Mass.App.Ct. 1, 421 N.E.2d 453, 458 n. 14 (1981) (emphasizing that court was "not in any way intimat[ing] that [sections 42 and 42A] change the ambit of trade secret protection in a civil action"); *Commonwealth v. Robinson,* 7 Mass.App.Ct. 470, 388 N.E.2d 705, 706 (1979) (common law civil cases involving misappropriation of trade secrets enlighten "the meaning of the term 'trade secret' under [section 30(4) ]"); *see also* Laurence H. Reece, III, *Trade Secret Misappropriation: A Review and Analysis of Massachusetts Law,* 71 Mass.L.Rev. 171, 182 (1986) (section 42 "simply restates what is available from the courts under common law and general equity principles").

*FACTUAL BACKGROUND* [4]

From 1988 to March 1996 Cowen worked as an employee of Harvard Apparatus, Inc. ("Old Harvard"). In 1988 and 1989 Cowen wrote the computer software source code ("the source code") for the Harvard 11 pump and the more advanced Harvard 44 pump.[5] These pumps are bioscience pumps. As such, they differ from medical pumps which are regulated by the United States Food and Drug Administration ("the FDA").

After completing the source code for both the Harvard 11 and the Harvard 44 pumps in 1989, Cowen describes his involvement in these pumps as "minimal." He only earned a salary of $39,000 in 1988 and $42,900 in 1989.

In 1990 Old Harvard began developing a medical pump, eventually known as the Harvard 2 Medical Pump ("the Harvard 2 pump"). From 1990 or 1991 to January 3, 1997, Cowen worked "more or less exclusively" on developing the Harvard 2 pump. He developed the source code for the Harvard 11 and Harvard 44 pumps using Assembler language. Cowen used a more advanced version of this language to develop the source code for the Harvard 2 pump. According to Cowen, he "used the 44 code as the *starting point* for [his] development of the Harvard 2 [pump]." In essence, the source code of the Harvard 44 pump was modified to suit the requirements of a medical pump.

During his employment at Old Harvard, Cowen describes the security measures as lax. In particular, Cowen avers that Old Harvard did not install a burglar alarm system but simply locked the doors at the end of the work day. Engineering and production filing cabinets were not locked. Engineering computers were not password protected. Cowen recalls at least one, unidentified customer who removed the computer chip containing the machine code for the Harvard 44 pump and duplicated the machine code.[6] With the knowledge of Old Harvard management, Cowen published an unidentified "source code" in a trade journal and received $100 compensation.

Cowen further notes that the machine code in "the Harvard pumps" can be acquired by removing the chip from the pump and reading the code with a device called an EPROM programmer. Cowen also points out that in 1992 Old Harvard instituted litigation against a former employee accusing him of selling pumps similar to Harvard's pumps.[7] Cowen states that the employee continues to sell these pumps presumably without a licensing agreement.[8] Cowen also describes three instances where Old Harvard supplied three customers with the source codes for the Harvard 11 pump and/or the Harvard 2 pump.

4. Facts are taken from the summary judgment record. This summary is not a recitation of the entire record which this court has thoroughly reviewed. Disputes are readily apparent. It is in the discussion section wherein this court resolves the factual disputes in favor of the nonmoving party. The discussion section also contains additional recitations of the facts where appropriate.

5. Old and New Harvard also produce the Harvard 22 pump. This pump has two horizontally mounted syringes on the top of the unit and understates the name on the pump. (Docket Entry # 77, Ex. A & Ex. A(A)).

6. Machine code is the software source code " 'burned' into [the pump's] computer chip." (Docket Entry # 74, Ex. A).

7. The complaint in that litigation accuses the employee of "marketing a series of pumps that are almost exact copies of the style, appearance, trademark and dress of Harvard pumps." (Docket Entry # 74, App. A–11).

8. As averred by David Green ("Green"), President of Harvard Apparatus, Inc., this litigation was settled by Old Harvard and the settlement allowed the employee to continue manufacturing pumps that look similar to "Harvard's products." (Docket Entry # 77, Ex. A). The settlement also required the employee to change certain trade dress aspects of his pump.

On the other hand, Diane Gargano ("Gargano"), a former employee of Old Harvard and President of Harvard Clinical Technologies, Inc. ("Harvard Clinical"),[9] characterizes Cowen's claim that Old Harvard failed to take reasonable steps to safeguard its source code as inaccurate. She avers that all employees with access to Old Harvard's technology [10] were required to sign a confidential non-disclosure agreement. Gargano also sufficiently controverts Cowen's description of the aforementioned disclosure of source codes to three Old Harvard customers. In particular, she avers that all three customers were required to execute confidentiality agreements before being provided with such source codes.

Significantly, on January 27, 1995, Cowen himself signed a confidential non-disclosure agreement. Prior to signing the agreement, Cowen modified portions of the language. He believes that the modifications allow him to develop his own line of bioscience pumps. According to Cowen, he let management at Old Harvard know he was working on his own technology. He testified that he arbitrarily decided what pieces of the technology were his and what pieces belonged to Old Harvard or Harvard Medical, Inc.[11]

Under the confidentiality agreement, Cowen assigned to Old Harvard all rights to the intellectual property of Cowen with respect to all inventions, improvements or discoveries relating to the pumps, base technology, improvements and field improvements ("PBTIFI") at Old Harvard.[12] The agreement defines "field" as products requiring FDA approval,[13] "pumps" as medical infusion pumps, "improvements" as any improvement, alteration or modification to base technology and "field improvements" as any improvement, alteration or modification to medical infusion pumps and technology in the field which are not covered by the base technology. The agreement defines "base technology" as "all materials and technical information relating to [the Harvard 2 pump] and [medical infusion pumps which require FDA approval]." Such "materials and technical information" include, *inter alia,* computer programs, trade secrets, intellectual property rights and other proprietary information relating thereto. The term "base technology" therefore encompasses computer programs, i.e., source code, relating to the Harvard 2 pump. Cowen acknowledges that he used the source code of the Harvard 44 pump as the starting point to develop the Harvard 2 pump.

After signing the January 1995 confidentiality agreement, Cowen continued to work on the Harvard 2 pump. He avers that in August 1995 he informed Grindle that he intended to develop his own line of bioscience pumps.[14] In a memorandum

---

9. As explained *infra,* Harvard Clinical is an outgrowth of the medical assets formerly owned by Old Harvard and transferred to various entities after the March 1996 acquisition of the bioscience division.

10. She includes "source code" within the scope of "Harvard's technology." A reasonable inference from this statement is that such source code included the source code for the Harvard 44 pump.

11. Paul Grindle ("Grindle"), owner of Old Harvard, strongly disagrees with Cowen's belief regarding his authority to use technology he developed at Old Harvard. Grindle avers that Cowen never had permission to use or obtain for his own use any technology Cowen developed for Old Harvard including any portion of source code. Grindle also characteriz-

es Cowen's assertion that management recognized that Cowen owned the technology he developed during Old Harvard business hours as "ridiculous."

12. Cowen's modifications primarily consist of language inserting the words "relating to the PBTIFI." The "B" letter stands for "base technologies," a term which includes computer programs, trade secrets and proprietary information relating to the Harvard 2 pump.

13. As previously stated, for purposes of summary judgment, Cowen avers that bioscience pumps differ from medical pumps, which are strictly regulated by the FDA.

14. Cowen states that he first conceived of the idea of developing his own line of bioscience pumps in 1991 and made no secret of his

dated August 10, 1995, Cowen further advised Grindle that he planned to start a new business in the field of industrial control systems.[15]

On August 24, 1995, Cowen received an offer of employment from another business. He informed Gargano of the offer who, in turn, informed Grindle. As a result, Old Harvard and Cowen entered into a one page employment contract dated August 29, 1995. As set forth in the agreement, Old Harvard agreed to increase Cowen's compensation by 10% and to pay Cowen a bonus upon completion of the validation testing for the Harvard 2 pump. In return, Cowen agreed to remain an employee of Old Harvard until the completion of such validation testing. Cowen viewed the contract, signed by Grindle, as an affirmation of his representations to develop his own line of bioscience pumps.

In the fall of 1995, at the suggestion of Harold Sossen, Vice President of Research and Development at Old Harvard, Cowen and an electrical engineer at Old Harvard by the name of John Rudser decided to jointly develop a bioscience pump. According to Cowen, this pump would directly compete with "Harvard's pumps." By the end of February 1996, however, the project stalled and never came to fruition. After the March 1996 acquisition, described *infra*, Cowen again decided to develop a bioscience pump albeit different from the previously envisioned pump. This pump devolved into the Yale pump.

In March 1996 Grindle sold the assets of Old Harvard that comprised the bioscience division to an acquisition company, Harvard Apparatus Acquisition Company, Inc. Grindle retained the assets of Old Harvard relating to the medical division. The medical division's assets included the Harvard

2 pump and the right to use the name, Harvard Medical, Inc. ("Harvard Medical").

After the acquisition, the acquisition company changed its name to Harvard Apparatus, Inc., i.e., New Harvard. Although Grindle initially received a 27.7% interest in New Harvard, he later sold this interest back to the company.

Grindle continued to do business first under the name of Walsh, Inc. and/or Walsh & Bailey, Inc. and thereafter under the name of Harvard Medical. Grindle and Gargano respectively held 85% and 15% ownership interests in Harvard Medical.[16] As noted in a March 1996 memorandum, Cowen became an employee of Harvard Medical and continued to develop the Harvard 2 pump.

Shortly before the acquisition, Cowen was asked to sign an agreement similar to the one Cowen signed on January 27, 1995, albeit without Cowen's amendments. Cowen refused to sign the confidentiality agreement and explained that he would be developing his own bioscience pump. He asked to speak with the Chief Executive Officer of New Harvard, Chane Graziano ("Graziano"), but was advised it would not be necessary.

Immediately after the acquisition, Cowen decided to begin developing a low cost bioscience pump which eventually became the Yale pump. At this time, Cowen spoke with Gargano, then President of Harvard Medical, and later met with Graziano about his plans. Indeed, on March 28, 1996, Cowen sent a memorandum detailing his plan to form a new company to design and sell a line of lower cost pumps for non-medical applications to Graziano,

---

intentions to Old Harvard management. Cowen considered himself entitled to use the code he wrote at Old Harvard to develop his own bioscience pumps.

15. Cowen notes that the new business, Harvard Innovations, would not be a competitor to Old Harvard. At his deposition, however, Cowen testified that when he first approached

Grindle in or around 1995 he believed that the products he would develop would be competitive with Old Harvard.

16. In April 1997 the company changed its name to the current name of Harvard Clinical.

Grindle, Gargano and the President of New Harvard. Cowen also unsuccessfully solicited an agreement with Graziano to allow New Harvard to market the pumps.

In the spring of 1996 Cowen worked part time developing the Yale pump. Upon leaving Harvard Medical on January 3, 1997, he devoted himself full time to the work.

In designing the software for the Yale pump, Cowen used his skill and knowledge and insists he did not copy the source code of the Harvard 11 or the Harvard 44 pumps. He points out that he worked on these pumps primarily in 1990 and 1991 and avers that he last worked with the source code of the Harvard 44 pump in approximately April 1995.[17] He attests that he archived the source codes of the Harvard pumps in a file on his "employer's computer" and did not take the file with him when he left Harvard Medical's employ on January 3, 1997.

On the other hand, in developing the Yale pump, as explained by plaintiff's experts, Cowen used the same microprocessor chip, the same language and similar architecture to that employed in the Harvard 44 pump.[18] Plaintiff's experts note that the Yale pump uses the same language (Assembly) for its source code as the Harvard 44 pump.[19] Based on their review and analysis of the source codes of the Harvard 44 and the Yale pumps, plaintiff's experts conclude that the source code used in the Yale pump was derived in whole or in part from the software in the Harvard 44 pump. They cite to a large number of similarities in code instructions such as a high level of functions as well as a large number of identical or nearly identical variables, labels and constants. Plaintiff's experts explain the high degree of similarity between the source codes of the Harvard 44 and the Yale pump by concluding that the Yale pump's source code is an evolved version of a duplicate of the source code in the Harvard 44 pump.[20]

Cowen's expert disagrees with this hypothesis and develops an alternative synopsis of Cowen's development of the firmware of the Yale pump.[21] He explains Cowen's use of macro-assembly language as a logical need to use faster code without the need for portability. He also discounts the similarities or parallels found by plaintiff's experts between the features or characteristics of the source codes in the Yale and Harvard 44 pumps.

Pumps at Old Harvard and, in particular, the Harvard 11 and 22 pumps, contain unique features which identify the source of the pumps as produced by Old or New Harvard. In fact, from the late 1980's to May 1998 Old and New Harvard sold the Harvard 11 pump without any product or company name on the case.[22] Green avers that the design of the Harvard products identifies the source of the pumps as produced by Harvard by: (1) the position of

---

**17.** He does acknowledge that he spent a small amount of time examining a small portion of the source code in the course of answering one or two questions after April 1995.

**18.** As explained by plaintiff's experts, architecture describes how the functions and data values in software interact.

**19.** Cowen's expert, Peter C. Schoaff, distinguishes the Assembly language used in the Harvard 11 and the Harvard 44 pumps from the use of macros in the code base and thus Macro–Assembly language in the Yale pump.

**20.** In making these findings, which are sufficient, together with the January 1995 confidential non-disclosure agreement and other evidence in the record, to overcome summary judgment, this court has not relied on the use of the words "suspicious" and "influenced" by plaintiff's experts. To the contrary, the report is sufficiently persuasive without these words. Cowen's motion to strike (Docket Entry # 71) these words from the report is therefore denied as moot.

**21.** Firmware consists of the source code embedded on a computer chip.

**22.** Currently, the Harvard 11 pump is sold with the name "Harvard Apparatus" on the front left corner. Cowen's pump has the name of his company "Yale Apparatus" in the same location on the Yale pump.

the syringe on the top of the pump in a horizontal direction with a left to right "pusher block travel;" (2) the color scheme of the pumps; (3) the use of twin steel guide rods and black plastic "pusher block and barrel clamp;" (4) the dimension of the pumps as "approximately 'shoe size;'" and (5) the location of the key pad. (Docket Entry # 77, Ex. A).

In addition, Graziano testified that a consumer is likely to purchase the Yale pump in the mistaken belief that he is purchasing the Harvard 11 pump, which has a list cost of $1,245. He noted that customers have telephoned the company and inquired about what was "going on." (Docket Entry # 74, App. A–12).

Examining the features of the Harvard 11 pump which identify its origin, Mark Norige ("Norige") pointed to the top loading horizontal lie of the syringe, the uncluttered display with few keys and the clean lines of the design.[23] The primary significance of these characteristics in the mind of the public is to identify the source of the product as opposed to the product itself, according to Norige. These features in the Harvard pumps also differ from the features in the pumps of three of Harvard's major competitors. (Docket Entry # 77, Ex. A(A) –(C)). Indeed, beginning in the late 1980s, Old Harvard, and thereafter New Harvard until May 1998, did not sell the Harvard 11 pump with a name on the case and therefore relied on the pumps's unique features to identify the source of the pump as produced by Har-

vard. Norige also described a number of instances wherein one or more suppliers and distributers contacted the company about the similar look of the Yale pump. Graziano stated that "numerous times" either customers, suppliers or other persons who had seen advertising for the Yale pump contacted the company about what was "going on." (Docket Entry # 74, App. A–12 & A–13).

New Harvard sells its pumps for use in pre-clinical animal testing, laboratory testing, scientific equipment and industrial processes. It principally markets the pumps through catalogues to existing customers. They also market pumps through distributors, subsidiary offices, trade shows, trade journals and the Internet. According to Norige, there is a brand recognition of the pumps as high quality and reliable products which has existed for a "very long time." (Docket Entry # 74, App. A–13).

## DISCUSSION

### I. Trade Dress Infringement

Plaintiff moves for summary judgment on the trade dress[24] infringement claim under section 43(a) of the Lanham Act. In so doing, plaintiff submits that Cowen fails to offer sufficient evidence of the three elements required to establish a trade dress cause of action. These three elements are as follows: (1) nonfunctionality; (2) likelihood of confusion; and (3)

---

23. Norige testified that a syringe does not have to lie in a horizontal direction. In addition, its shape could be round or square. The parallel guide rods also do not have to be made of stainless steel and machine black Derlin. There are also a number of ways to hold the syringe in place. A pumps's color is also a nonfunctional element and, according to Norige, the Harvard 11 pump and the Yale pump employ similar colors. Furthermore, Norige points to the stainless steel guide rods and that the material of the drive mechanism appears to be black Derlin. At his deposition, Norige identified a number of other similarities between the nonfunctional characteristics of the Harvard 11 and the Yale pumps. According to Norige, an appreciable number of

reasonably prudent purchasers would be confused by the Harvard 11 and the Yale pumps. (Docket Entry # 74, App. A–13). In contrast, pumps manufactured by four of Old and/or New Harvard's major competitors (other than Yale) do not appear as similar to one or more of the Harvard pumps. (Docket Entry # 77, Ex. A(A)–(C)).

24. Trade dress includes the design as well as the "appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer." I.P. Lund Trading v. Kohler Company, 163 F.3d 27, 35 (1st Cir.1998).

distinctiveness either through inherent distinctiveness or secondary meaning. (Docket Entry # 74).

Plaintiff is correct inasmuch as these three elements are required to succeed in a trade dress infringement claim.[25] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Accordingly, this court turns to these elements and addresses them seriatim.

1. *Functionality*

Section 43(a) only protects nonfunctional trade dress. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. at 775, 112 S.Ct. 2753. The underlying burden is on the plaintiff to establish the nonfunctionality of its trade dress. *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 1345, 146 L.Ed.2d 182 (2000); 15 U.S.C. § 1125(c)(3).

"The core inquiry into whether trade dress is functional requires examination of the effects that granting protection to a product will have on the ability of others to compete." *I.P. Lund Trading v. Kohler Company*, 163 F.3d 27, 37 (1st Cir.1998). A feature of a product is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputational-related disadvantage." *Qualitex Company v. Jacobson Products Company, Inc.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (internal quotation marks omitted). Functionality also "turns in part on whether granting protection to a mark would permit one competitor to interfere with legiti-

mate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient." *I.P. Lund Trading v. Kohler Company*, 163 F.3d at 37 (internal quotation marks omitted). For example, the wall mounted feature of a wall mounted faucet is functional inasmuch as protection for such a feature would unduly hinder and restrict competition in the wall-mounted faucet market. *I.P. Lund Trading v. Kohler Company*, 118 F.Supp.2d 92, 102 (D.Mass.2000). Norige's deposition testimony, summarized *supra*,[26] suffices to establish a genuine issue of material fact as to the functionality of certain features of the Harvard 11 pump.

2. *Likelihood of Confusion*

In order to succeed on its trade dress claim, the plaintiff must establish "that the defendant's use is likely to confuse the public, thereby harming the plaintiff." *Star Financial Services, Inc. v. Aastar Mortgage Corporation*, 89 F.3d 5, 9 (1st Cir.1996). Furthermore, the underlying burden is to show "a 'substantial' likelihood," *Star Financial Services, Inc. v. Aastar Mortgage Corporation*, 89 F.3d at 9, of confusing "an appreciable number of reasonably prudent purchasers exercising ordinary care." *I.P. Lund Trading v. Kohler Company*, 163 F.3d at 43 (quoting, in parenthetical, *International Association of Machinists & Aerospace Workers v. Winship Green Nursing Center*, 103 F.3d 196, 201 (1st Cir.1996)).

The First Circuit identifies eight, nonexclusive factors to examine in determining likelihood of confusion. *Volkswagenwerk Aktiengesellschaft v. Wheeler,*

**25.** In addition thereto, however, the plaintiff must establish that he uses and thereby owns "the mark in question, and that the defendant's mark is similar to or the same as the plaintiff's mark." *I.P. Lund Trading v. Kohler Company*, 163 F.3d 27, 43 (1st Cir.1998) (noting these requirements in context of product design type of trade dress claim); *Star Financial Services, Inc. v. Aastar Mortgage Corporation*, 89 F.3d 5, 9 (1st Cir.1996). The mark

must also be used in interstate commerce. *I.P. Lund Trading v. Kohler Company*, 163 F.3d at 36. Because Cowen does not seek summary judgment based on the absence of these elements with respect to plaintiff's trade dress claim, this opinion confines its analysis to the above noted, three required elements.

**26.** See, for example, footnote number 23.

814 F.2d 812, 817 (1st Cir.1987). They are as follows:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d at 817; *accord I.P. Lund Trading v. Kohler Company,* 163 F.3d at 43. No one factor is determinative but each must be examined. *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d at 817.

■ Examining the total effect of the nonfunctional features of the Yale pump and the Harvard 11 pump leads to an overall image of similarity. For example, each uses a horizontal syringe mounted on top of the unit, black Derlin material for the drive mechanism and black rubber feet. Both pumps also have key pads with angled fronts and similar contrasting colors. The location of the name on the current Harvard 11 pump and the Yale pumps is the same.

The parties provide similar goods, i.e., bioscience pumps. Although the channel of trade for the Yale pump is not clear, from the deposition testimony in the record, it appears to market, at least at a minimum, to scientists as does the Harvard 11 pump. Cowen, however, advertises the Yale pump as a more inexpensive alternative to more limited function pumps. Cowen appears to use the Internet to advertise as does New Harvard. (Docket Entry # 80). It is unclear whether Cowen uses trade journals and catalogues as does New Harvard.

Evidence of actual confusion among reasonably prudent purchasers exercising ordinary care is weak in light of the absence of identified customers. Norige's deposition testimony, summarized *supra,* however, adds a degree of support to this factor. Furthermore, the cost of the Yale pump does not necessarily belie the likelihood of confusing a reasonably prudent purchaser that he was buying the Harvard 11 pump when, in fact, he was purchasing the Yale pump. Graziano testified that a typical scientist does not "think twice" about making a thousand dollar purchase. In addition, according to Graziano, customers have telephoned to inquire about what was "going on." (Docket Entry # 74, App. A–12).

Although disputed, Cowen's intent to copy the Harvard pumps finds circumstantial evidentiary support in the record. On the other hand, this factor is only accorded "little weight." *I.P. Lund Trading v. Kohler Company,* 163 F.3d at 44. Finally, Old and New Harvard have used the trade dress for the Harvard 11 pump for a significant period of time. Harvard Apparatus, Inc. is primarily known in the marketplace for making syringe pumps notwithstanding its manufacture of other products. (Docket Entry # 74, App. A–12). According to Norige, brand recognition has existed for a "very long time." [27] (Docket Entry # 74, App. A–13).

In sum, there is more than sufficient evidence for a fact finder to conclude in plaintiff's favor that there exists a substantial likelihood of confusion.

### 3. *Distinctiveness*

■ Trade dress extends to both product packaging and product design. *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* 120 S.Ct. at 1342. Encasing a product in distinctive "dress" or packaging is often "to identify the source of the product." *Wal–Mart Stores, Inc. v. Samara*

---

**27.** "In assessing a mark's strength, the trier of fact considers evidence of the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark." *Star Financial Services, Inc. v. Aastar Mortgage Corporation,* 89 F.3d at 11.

*Brothers, Inc.*, 120 S.Ct. at 1344. Designing a product in a particular manner, however, typically serves utilitarian or aesthetic purposes, *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 120 S.Ct. at 1344, unrelated to the primary purpose of trade dress protection which concerns protecting the identification of a product's source. *See I.P. Lund Trading v. Kohler Company*, 163 F.3d at 35–36.

■ Bestowing trade dress protection for product packaging acknowledges the owner's legitimate proprietary interest in the unique and informational device of the packaging as a means to identify the source of the product. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. at 770–771, 112 S.Ct. 2753. Product packaging therefore receives trade dress protection upon a showing of either inherent distinctiveness or secondary meaning. *Two Pesos; Inc. v. Taco Cabana, Inc.*, 505 U.S. at 770–771, 776, 112 S.Ct. 2753; *see also Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 120 S.Ct. at 1344–1345. A product's design satisfies the distinctiveness element and receives trade dress protection, however, only upon a showing of acquired or so-called secondary meaning. *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 120 S.Ct. at 1346.

■ For present purposes, it is unnecessary to determine if the nonfunctional elements of the Harvard 11 pump constitute packaging or design inasmuch as there is sufficient evidence of secondary meaning to survive summary judgment.[28] Secondary meaning requires a manufacturer to "show that, in the minds of the public, the primary significance of a product feature or term is to identify the

source of the product rather than the product itself." *I.P. Lund Trading v. Kohler Company*, 163 F.3d at 41–42. In other words, plaintiff bears the burden of showing that a substantial or significant quantity of the consuming public primarily associates the trade dress of the Harvard 11 pump as designating the origin of the pump, i.e., Old and now New Harvard. *See Boston Beer Company v. Slesar Brothers Brewing Company*, 9 F.3d 175, 181–182 (1st Cir.1993). The primary significance of the trade dress to the consuming public must be the source of the product. *See I.P. Lund Trading v. Kohler Company*, 163 F.3d at 42; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. at 768–769, 112 S.Ct. 2753 (approving use of the five categories in *Abercrombie & Fitch Company v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), to classify mark as inherently distinctive in product packaging case).[29]

Green's affidavit as well as the depositions of Norige and Graziano suffice to create a genuine issue of material fact as to secondary meaning. Graziano notes that the company has a strong market position and is known for making syringe pumps. Green identified a number of unique nonfunctional features of the Harvard 11 pump which create its overall image. He testified that such features identified the source of the product. Norige similarly identified various nonfunctional features of the Harvard 11 pump which, from the standpoint of the pump's appearance, identified the source of the pump as produced by Harvard. Although the record does not contain the oftentimes valuable evidence of customer surveys, it is also true that one or more suppliers, dis-

---

**28.** In a recent case in this district, the court distinguished product packaging from product design by noting that, "an item is the product if it is the essential commodity being purchased and consumed rather than the dress which presents the product." *McKernan v. Burek*, 118 F.Supp.2d 119, 124 (D.Mass.2000).

**29.** These five categories are generic, descriptive, suggestive, arbitrary and fanciful. The latter three categories generally serve to identify the source of a product and, as such, are inherently distinctive. Descriptive marks, while not inherently distinctive, may acquire a secondary meaning in the minds of the consuming public. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. at 768–769, 112 S.Ct. 2753.

tributors and customers telephoned the company to ask what was "going on." The Harvard pumps' place in the market is established as evidenced by Norige's deposition testimony concerning brand recognition and repeat customers who only purchase Harvard pumps. The pumps of Harvard Apparatus, Inc.'s major competitors show significant differences in the appearance and overall image of the nonfunctional features thereby supporting a finding that the trade dress of the Harvard 11 pump serves primarily to identify its source to the consuming public. The company has advertised its pumps extensively through catalogues and receives telephone calls on a daily basis due to such catalogues. Summary judgment on the basis of the absence of evidence of secondary meaning is therefore inappropriate.

## II. *Misappropriation of Trade Secret and Proprietary Business Information Claims*

■ Plaintiff alleges both that Cowen misappropriated its trade secret in the source code for the Harvard pumps under Massachusetts common law and that Cowen improperly used the source code which constitutes confidential and proprietary business information. At the outset, it is worth acknowledging that the First Circuit recently expressed "some doubt about whether and how the Massachusetts courts differentiate among confidential information, proprietary information, and trade secrets." *Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 8 (1st Cir. 2000) (dicta in course of reviewing cases cited by one of the parties). Examining cases involving trade secrets, Massachusetts case law undoubtedly proscribes former employees from misappropriating the trade secrets learned during their former employment.[30]

As an initial element of the cause of action, the plaintiff must show that the information constitutes a trade secret. Under Massachusetts case law,

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it ... A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article."

*Eastern Marble Products Corporation v. Roman Marble, Inc.*, 372 Mass. 835, 364 N.E.2d 799, 801 (1977) (quoting *Restatement (First) of Torts* § 757, comment b (1939) ("section 757")); *accord CVD, Inc. v. Raytheon Company*, 769 F.2d 842, 850 (1st Cir.1985) (same).

It is true that Cowen avers that the software for the Harvard 11 and 44 pumps is primitive. Nevertheless, there is more than enough evidence for purposes of summary judgment for a reasonable fact finder to conclude that the source code for the Harvard pumps, including the source code for the Harvard 44 pump, falls comfortably within the above definition of a trade secret of Old Harvard acquired during the acquisition by New Harvard.

In order to garner protection as a trade secret, however, the information must be "in fact and in law [ ] confidential." *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 282 N.E.2d 921, 925 (1972) ("*Jet Spray I* "); *Phillip Morris Inc. v. Reilly*, 113 F.Supp.2d 129, 135 (D.Mass.2000).

---

**30.** As noted by the Massachusetts Supreme Judicial Court ("SJC"), an employee who acquires confidential information during his employment "may be prohibited, after the termination of his employment, 'from using or disclosing confidential information so acquired.' " *Jet Spray Cooler, Inc. v. Crampton,*

377 Mass. 159, 385 N.E.2d 1349, 1354 (1979); *see generally Lantor Inc. v. Ellis,* 1998 WL 726502 at *11 (Mass.Super. Oct. 2, 1998) (former employee's obligations do not include "an obligation not to compete ... but they do include an obligation" not to reveal trade secrets obtained during employment).

"[T]he result in each case depends on the conduct of the parties and the nature of the information." *Jet Spray I*, 282 N.E.2d at 925. In the context of an employment relationship, it is well settled that an employee's general skill and knowledge is the type of information that he can carry away and use after termination of his employment.[31] *See CVD, Inc. v. Raytheon Company*, 769 F.2d at 852; *Dynamics Research Corporation v. Analytic Sciences Corporation*, 9 Mass.App.Ct. 254, 400 N.E.2d 1274, 1282 (1980).

Although no general rule determines whether the information is confidential, the six factors cited in comment b of section 757 are relevant. *Jet Spray I*, 282 N.E.2d at 925. They are as follows:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray I*, 282 N.E.2d at 925; *Phillip Morris Inc. v. Reilly*, 113 F.Supp.2d at 135; *Restatement (First) of Torts* § 757, comment b (1939); *see also CVD, Inc. v. Raytheon Company*, 769 F.2d at 850 (secrecy is "[t]he cornerstone of a trade secret").

Furthermore, as intimated by the first factor as well as by the fourth factor de-

scribed *infra* in the context of the reasonableness of the security precautions, "Once a trade secret enters the public domain, the possessor's exclusive rights to the secret are lost." *CVD, Inc. v. Raytheon Company*, 769 F.2d at 850. " 'Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.' " *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 260 N.E.2d 723, 729 (1970) (quoting comment b of section 757); *see also Bonacorso Construction Company v. Master Builders, Inc.*, 1991 WL 72796 at * 4–5 (D.Mass. April 24, 1991).

Although Cowen places the issue as to whether the source code for the Harvard pump is in law and in fact confidential in doubt, there is sufficient evidence in the summary judgment record to create a genuine issue of material fact. Viewing the record in plaintiff's favor, although three clients of Old Harvard know the source code, they signed confidentiality agreements. Similarly, employees with access to the source code signed confidential non-disclosure agreements. A reasonable inference from the record is that the source code is quite valuable to Old as well as New Harvard. Old Harvard expended a moderate amount of effort and money to develop the source code. It would take a computer literate individual at least some effort to obtain an EPROM programmer, acquire the chip and then read the source code therefrom. While the evidence, on the whole, weighs in Cowen's favor, it is insufficient to merit summary judgment.

In addition to the foregoing, the possessor of a trade secret must take reasonable security precautions. *USM Cor-*

---

**31.** The issue of whether the information lies within the employee's general skill or knowledge depends, in part, upon the amount of knowledge and skill the employee had in the relevant area at the start of his employment. *See Dynamics Research Corporation v. Analytic Sciences Corporation*, 9 Mass.App.Ct. 254, 400 N.E.2d 1274, 1282 (1980); *see also* Laurence H. Reece, III, *Trade Secret Misappropriation: A Review and Analysis of Massachu-*

*setts Law*, 71 Mass.L.Rev. 171, 180 (1986). The principle of allowing the employee to carry away and use his general knowledge and skill acquired during his employment "effectuates the public interest in labor mobility, promotes the employee's freedom to practice a profession, and freedom of competition." *CVD, Inc. v. Raytheon Company*, 769 F.2d at 852.

*poration v. Marson Fastener Corporation,* 379 Mass. 90, 393 N.E.2d 895, 900 (1979). Although no general rule determines the reasonableness of the protective measures, relevant factors:

> include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed ... to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable" by the third parties through patent applications or unrestricted product marketing.

*USM Corporation v. Marson Fastener Corporation,* 393 N.E.2d at 900; *Trent Partners and Associates, Inc. v. Digital Equipment Corporation,* 120 F.Supp.2d 84, 110 (D.Mass.1999) (citing *USM* and same four factors); *Baystate Technologies, Inc. v. Bentley Systems, Inc.,* 946 F.Supp. 1079, 1092 (D.Mass.1996); *see also Eastern Marble Products Corporation v. Roman Marble, Inc.,* 364 N.E.2d at 802 (recognizing that requiring employees to sign confidentiality agreements and separating manufacturing area from public view supported finding that possessor of trade secret adequately preserved the necessary secrecy of manufacturing process). In making this determination, "[A] court should consider the relationship and the conduct of the parties." *USM Corporation v. Marson Fastener Corporation,* 393 N.E.2d at 900 (further noting the appropriateness of balancing the plaintiff's conduct in maintaining security measures

against the defendant's conduct in acquiring the information).

Viewing the record in plaintiff's favor for purposes of summary judgment only, the January 1995 non-disclosure agreement signed by Cowen covered the source code for the Harvard 44 pump. As averred by Gargano, all employees with access to Old Harvard's technology, including source code, had to sign confidential non-disclosure agreements. Although Old Harvard disclosed the source code to three customers, it required them to execute confidentiality agreements. The information was not placed entirely within the public domain. The existence of the non-disclosure agreements, at a minimum, put Old Harvard employees, including Cowen, on notice that the source code involved secret information. *See, e.g., USM Corporation v. Marson Fastener Corporation,* 393 N.E.2d at 901 (recognizing that nondisclosure agreements did not have to list the secret information in order to put employees on notice); *Eastern Marble Products Corporation v. Roman Marble, Inc.,* 364 N.E.2d at 802 (although terms of confidentiality agreement may not technically have covered information, the agreement placed "employees on notice that secrets were involved"). Accordingly, summary judgment on the reasonableness of the security measures is unwarranted.

Finally, even assuming arguendo for purposes of summary judgment that an essential element of the cause of action is "that the defendant made use of the disclosure in breach of the confidence reposed in him," [32] *Burten v. Milton Bradley Company,* 763 F.2d 461, 463 (1st Cir.1985) (citing *Restatement (First) of Torts* § 757 (1939)), there is little doubt that Cowen used the source code in light of the report of plaintiff's experts.[33] A breach of confidence

---

**32.** As expressed by the SJC, "the essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another." *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 385

N.E.2d 1349, 1354 (1979). Whether Cowen had permission to use the source code depends, in part, on the reach of the January 1995 confidential non-disclosure agreement.

**33.** Use or disclosure is, of course, an essential element.

may arise by Cowen's breach of the January 1995 confidential non-disclosure agreement. *See Restatement (First) of Torts* § 757, comment on clause b (1939) ("breach of confidence under the rule stated in this Clause may also be a breach of contract"); *see also* Laurence H. Reece, III, *Trade Secret Misappropriation: A Review and Analysis of Massachusetts Law,* 71 Mass.L.Rev. 171, 176 (1986) (wrongful acquisition by employee may arise where employee properly obtains trade secret but then uses or discloses it "in breach of contract or abuse of confidence"). For purposes of summary judgment, the agreement encompasses the source code for the Harvard 44 pump. Summary judgment as to Cowen's use of the source code in breach of the confidence reposed in him is therefore unwarranted. In light of the foregoing, Cowen cannot obtain summary judgment on the common law trade secret misappropriation claim.

■ Turning to the improper use of confidential and business proprietary information claim, the SJC recognizes that a plaintiff who cannot obtain trade secret protection either because the information does not technically fall within the above definition of a trade secret and/or the possessor of the trade secret failed to take the above described reasonable measures to protect the secrecy of the information may still maintain a cause of action against a person "who improperly procures" its confidential information. *USM Corporation v. Marson Fastener Corporation,* 393 N.E.2d at 903. Citing section 759 and comment b thereto of *Restatement (First) of Torts* (1939), the SJC first established this common law cause of action in *USM.*[34] As explained in comment b of section 759, the rule "applies to information about one's business whether or not it constitutes a trade secret" and is "applicable only when the information is procured by improper means." *Restatement (First) of Torts*

§ 757, comment b (1939) (further noting that the information must be confidential in order for the improper discovery to cause harm).

■ Confidentiality is required and, in a decision after *USM,* the SJC cites to the same, above-quoted, six factors to assess the requirement that the confidential and proprietary business information must be confidential. *Warner–Lambert Company v. Execuquest Corporation,* 427 Mass. 46, 691 N.E.2d 545, 547 & n. 5 (1998); *see also Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 565 N.E.2d 415, 418 (1991) (noting that gross sales was not "a 'trade secret' of the traditional kind" but still determining confidentiality based on factors set forth in *Jet Spray I* ); *Jet Spray I,* 282 N.E.2d at 925 (noting that both "trade secrets or information" require the plaintiff to demonstrate that he pursued course of conduct designed to inform his employees that the information was "to remain confidential"). For previously stated reasons, summary judgment on the confidentiality of the source code is inadvisable.

As to the impropriety, where, as here, the case involves a former employee, albeit of a predecessor corporation, "the major issue is not whether the defendant improperly acquired the information but whether the former employee may use or disclose information properly acquired." *USM Corporation v. Marson Fastener Corporation,* 393 N.E.2d at 903 n. 16. As previously noted, "an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of employment." *Dynamics Research Corporation v. Analytic Sciences Corporation,* 400 N.E.2d at 1282. The existence of the January 1995 confidential non-disclosure agreement encompassing, for purposes of summary judgment only, the source code of the Harvard 44 pump as well as Grindle's affidavit belie the conclusion that Cowen could free-

---

**34.** The genesis of the cause of action, however, may lie in *Jet Spray I* wherein the SJC stated, in dicta, that, "the duty to use confidential information is not limited to technical trade secrets." *Jet Spray I,* 282 N.E.2d at 924.

ly use the source code to develop the Yale pump. Accordingly, summary judgment on this cause of action is unavailing.

## CONCLUSION

In accordance with the foregoing discussion, the motion for summary judgment (Docket Entry # 70) is **DENIED.** The motion to strike (Docket Entry # 71) is **DENIED** as moot.[35] The parties shall appear for a status conference at 10:00 a.m. on February 8, 2001, to discuss a trial date. Plaintiff is directed to make certain filings described *supra* on or before February 8, 2001.

---

**35.** See footnote number 20.