JET SPRAY COOLER, INC. & another *vs.* GIFFORD K. CRAMPTON & others.

Middlesex.   February 8, 1972. — May 17, 1972.

Present: CUTTER, SPIEGEL, REARDON, & HENNESSEY, JJ.

*Trade Secret.   Unlawful Interference.*

A general rule, based upon basic principles of equity, is that where there has been no express promise by an employee not to use or disclose confidential information entrusted to him during his employment, although he may carry away and use general skill or knowledge acquired during the course of his employment, he may be enjoined in equity from using or disclosing confidential information so acquired. [839]

In equity suits involving trade secrets, the crucial issue to be determined is whether the information sought to be protected is in fact and in law confidential. [840]

One seeking to prevent the disclosure or use of trade secrets or information by former employees must demonstrate that he had pursued an active course of conduct designed to inform them that such secrets and information were to remain confidential. [841–842]

In a suit in equity against former employees of the plaintiff who had entered a competing business and were using information acquired by them while in the plaintiff's employ, the plaintiff was not entitled to relief respecting certain information as to which the employer took no steps to protect its secrecy and there was no finding that it was by its nature capable of being kept secret or was in fact confined to any restricted group of employees [843]; but the plaintiff was entitled to relief respecting an engineering report which had been prepared by an outside firm hired to recommend improvements in the plaintiff's product, only one copy of which had been available to the plaintiff and had been supplied to one of the defendants to read, and which was a trade secret even without periodic warnings and constant admonitions of secrecy to that defendant [843–844].

In a suit in equity where it appeared that a corporate defendant, as well as individual defendants who had formerly been employees of the plaintiff and had become stockholders, officers and directors of the defendant corporation, utilized a trade secret of the plaintiff and mutually enjoyed the benefits thereof, damages for such use should be assessed against all of them. [844]

BILL IN EQUITY filed in the Superior Court on August 14, 1964.

The suit was heard by *Kalus,* J., on a master's report.

*Morris Michelson* (*Joseph T. Fahy* with him) for the plaintiffs.

*Joseph Schneider* for the defendants.

HENNESSEY, J. By this bill the plaintiffs seek injunctive relief and damages for the alleged use of their trade secrets by the defendants. The plaintiffs appeal from two interlocutory decrees, which were entered by a Superior Court judge after the filing of a master's report, and from a final decree dismissing the bill.

We set forth the facts as found by the master. The plaintiffs are Massachusetts corporations engaged in the design, manufacture and sale of various types of visual display beverage dispensers. Both plaintiffs operate as a unit out of the same offices and at the same plant located in Waltham. The individual defendants were formerly employed by the plaintiffs and are now the officers, directors, employees and stockholders of Crathco, Inc., a corporation also engaged in the manufacture and sale of beverage dispensers.

In 1949, William Jacobs, the president and treasurer of the plaintiffs, conceived and designed the first magnetically pumped visual display beverage dispenser. The plaintiff corporations were organized in 1953 and have since continued the business of making and selling beverage dispensers. Since their inception the plaintiffs have conducted an extensive research and development program in a constant effort to improve their products and have, on occasion, consulted with independent engineering firms to help develop new products as well as to improve their existing products.

In 1957, the defendant Crampton was employed by the plaintiffs as general sales manager, and in 1961 his title was changed to national accounts manager. While employed by the plaintiffs, Crampton had access to all sales records and to the annual sales analyses. These records contained the names of all of the plaintiffs' domestic customers who purchased twenty or more units and showed the quantities purchased by each of them

from 1955 to 1961.    Crampton resigned from his employment with the plaintiffs in 1962.

The defendant Robert Landfield was hired as office manager by the plaintiffs in 1954 and later became comptroller and an officer and director of the plaintiffs.    The plaintiffs' financial and sales records were available to him at all times during his employment.    He was discharged in May, 1962.

The defendant Robert B. Thomson served as purchasing agent for the plaintiffs from May, 1957, to September, 1962.    Since he purchased all of the production parts necessary to manufacture the dispensers, he had in his possession a list of all of the plaintiffs' suppliers, which list indicated the nature of the items purchased together with their prices.    He also kept on his desk a business card file and a telephone list finder supplied by the plaintiffs which contained the names and telephone numbers of the suppliers he most frequently called.    Thomson added new names and numbers to the file as the occasion required.    He resigned from his position with the plaintiffs in 1962.

The defendant Alfred Armstrong was employed by the plaintiffs in August, 1959, as chief engineer and continued in that capacity until he left on November 2, 1962.    Prior to his employment with the plaintiffs, he had worked for several years in the refrigeration section of Westinghouse Electric Corporation.    However, he had no prior experience with the type of dispenser made by the plaintiffs.    As chief engineer, Armstrong's duties included making improvements and modifications on existing units and developing new designs.    He resigned from his employment with the plaintiffs in 1962.

All four individual defendants, together with Jacobs, and the plant superintendent, were members of a so called Executive Committee which met weekly at the plant.    On occasion, the production supervisor and the service manager were invited to participate in the meetings.    The weekly meetings included a discussion of all phases of the plaintiffs' operation, except engineering details of

research and development.   Another committee, the re-
search and development group, was comprised of Arm-
strong, Jacobs and individuals from Foster-Miller Asso-
ciates, a consulting engineering firm.   This group met
once a week to discuss research and development of new
products and improvements in existing products.

The master found that the individual defendants were
"trusted employees" of the plaintiffs and as such there
were at all times available to them such information and
data as would enable them to advance the interests of the
plaintiffs.   He also found that all records and reports
affecting the manufacturing and selling aspects of the
business were open for their inspection, and that "[i]t
was understood that all such records and the information
contained therein were to be used by them in furthering
the business interest of their employers [and that] [t]hey
were also aware of the fact that it was important that
competitors did not obtain the information conained in
these records."

Following their employment with the plaintiffs, Cramp-
ton, Thomson, and Armstrong, in 1962, formed Crathco
a company engaged in the manufacture and sale of bev-
erage dispensers similar to those manufactured by the
plaintiffs.   The defendants, in designing and developing
the Crathco dispenser, utilized all of the information and
knowledge which they had acquired while working for
the plaintiffs, including the information contained in the
Foster-Miller report, which will be particularly described
below in this opinion.

When the Crathco dispenser was ready for marketing,
Crampton, as sales manager, began to solicit orders
from prospective customers including customers of the
plaintiffs.   By 1964, Crathco was making sales to all of
the plaintiffs' largest customers.   We infer from the
master's findings that the sales to the plaintiffs' former
customers were due, in part, to the information possessed
by Crampton and acquired while he was employed as
the plaintiffs' sales manager.   In May, 1964, Landfield
joined Crathco as executive vice-president and director.

The plaintiffs argue that in developing the Crathco dispenser the defendants wrongfully used certain confidential information belonging to the plaintiffs. Specifically, they refer to (1) the defendants' use of the information contained in the plaintiffs' customer and supplier lists, (2) the incorporation in the Crathco dispenser of certain features of the plaintiffs' dispenser, and (3) the use of the engineering information contained in the Foster-Miller report.

1. The general rule is that "[i]n situations where there has been no express contract of an employee not to use or disclose confidential information entrusted to him during his employment, . . . although an employee may carry away and use general skill or knowledge acquired during the course of his employment, he may be enjoined from using or disclosing confidential information so acquired." *New England Overall Co. Inc.* v. *Woltmann,* 343 Mass. 69, 75. *Essex Trust Co.* v. *Enwright,* 214 Mass. 507, 511. *Aronson* v. *Orlov,* 228 Mass. 1, 4–5. *Junker* v. *Plummer,* 320 Mass. 76. The above stated rule is based upon "basic principles of equity" (*New England Overall Co. Inc.* v. *Woltmann,* 343 Mass. at 76) and upon an implied contract, growing out of the nature of the employer-employee relation. *Aronson* v. *Orlov,* 228 Mass. 1, 5.

We have applied the rule and reached varying results in numerous cases dealing with customers' and suppliers' lists (*Woolley's Laundry, Inc.* v. *Silva,* 304 Mass. 383; *New England Overall Co. Inc.* v. *Woltmann,* 343 Mass. 69), manufacturing processes (*Wireless Specialty Apparatus Co.* v. *Mica Condenser Co. Ltd.* 239 Mass. 158; *J. T. Healy & Son, Inc.* v. *James A. Murphy & Son, Inc.* 357 Mass. 728), merchandising techniques (*United Tool & Industrial Supply Co. Inc.* v. *Torrisi,* 356 Mass. 103), and other information gained by an employee in the course of his employment and used to the detriment of his former employer. *Essex Trust Co.* v. *Enwright,* 214 Mass. 507. *Horn Pond Ice Co.* v. *Pearson,* 267 Mass. 256. Indeed, the duty not to use confidential information is

not limited to technical trade secrets. "[I]t matters not, in such cases, whether the secrets be secrets of trade or secrets of title, or any other secrets of the party important to his interests." *Peabody* v. *Norfolk*, 98 Mass. 452, 459. See Restatement: Torts, § 757; comment b.

We have in cases such as the present one considered it significant that the former employee did or did not take actual lists or papers belonging to his former employer. *Padover* v. *Axelson*, 268 Mass. 148, 151. *DiAngeles* v. *Scauzillo*, 287 Mass. 291, 297–298. *New England Overall Co. Inc.* v. *Woltmann*, 343 Mass. 69, 74, 77. *American Window Cleaning Co. of Springfield* v. *Cohen*, 343 Mass. 195, 199. However, the fact that no list or paper was taken does not prevent the former employee from being enjoined if the information which he gained through his employment and retained in his memory is confidential in nature. See *Essex Trust Co.* v. *Enwright*, 214 Mass. 507; *Aronson* v. *Orlov*, 228 Mass. 1; *Horn Pond Ice Co.* v. *Pearson*, 267 Mass. 256.

2. The crucial issue to be determined in cases involving trade secrets, therefore, is whether the information sought to be protected is, in fact and in law, confidential. In our view, the result in each case depends on the conduct of the parties and the nature of the information. Although "no general and invariable rule can be laid down" (*Woolley's Laundry, Inc.* v. *Silva*, 304 Mass. 383, 389), the Restatement of Torts, § 757, comment b, sets out six factors of relevant inquiry: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

In *Wireless Specialty Apparatus Co.* v. *Mica Condenser*

*Co. Ltd.* 239 Mass. 158, 162, we said, ". . . [the defendants] understood or ought to have understood that the plaintiff intended to keep the processes secret." Similarly, in *Laughlin Filter Corp.* v. *Bird Mach. Co.* 319 Mass. 287, 289–290, we said, "[I]f the plaintiff considered that a confidential relationship was created, that had to be *expressed or otherwise brought to the attention of the defendant*" (emphasis added). In *Woolley's Laundry, Inc.* v. *Silva,* 304 Mass. 383, 390–391, where it was held that an employee who solicited his former employer's customers from a list committed to memory could not be enjoined, we said "[I]t would not have been difficult for the plaintiff to have imparted this knowledge under *conditions* that made it confidential. This was not done. The unexpressed intentions of the plaintiff cannot bind the defendant" (emphasis added).

In the case of *J. T. Healy & Son, Inc.* v. *James A. Murphy & Son, Inc.* 357 Mass. 728, 738, the information involved related to certain manufacturing processes. This court, in holding that no trade secrets or confidential information existed, stated that "[t]he essential characteristic of a trade secret . . . [is] secrecy . . . [and] if the person entitled to a trade secret wishes to have its exclusive use in his own business, he must not fail to take all proper and reasonable steps to keep it secret. He cannot lie back and do nothing to preserve its essential secret quality, particularly when the subject matter of the process becomes known to a number of individuals involved in its use or is observed in the course of manufacture within plain view of others. . . . He . . . must exercise eternal vigilance." The court further stated that the employee must be "constantly admonished" that information is a trade secret and "must be kept so."

The language in the *Healy* case makes it clear that one seeking to prevent the disclosure or use of trade secrets or information must demonstrate that he pursued an active course of conduct designed to inform his employees that such secrets and information were to remain confidential. This approach is in accord with the authori-

ties. "The subject matter of the trade secrets must be unknown i.e., known only to the owner and possibly several others to whom it was necessarily disclosed upon the admonition that its secrecy be maintained." 2 Callmann, Unfair Competition, § 53.3. See also Monopolies, Restraints of Trade, and Unfair Trade Practices, 55 Am. Jur. 2d, §§ 704–706.

3. Some of the information obtained by the four indivual defendants in the course of their employment with the plaintiffs and later used by them in their operations at Crathco were mailing lists of the plaintiffs' customers, financial and sales lists of a most comprehensive kind, and lists of all suppliers to the plaintiffs, including the nature of the plaintiffs' purchases and the prices paid. Although no lists were physically taken away by the defendants when they left the plaintiffs' employ, they were thoroughly familiar with the contents of the lists.

In addition, the four individual defendants, particularly Armstrong, were aware of the details of improvements which had been developed in the plaintiffs' laboratory, and which had not yet been incorporated in the plaintiffs' dispensers on the market. These improvements included a push handle valve, a plastic pump cover, and a neutralizing process. These same improvements were later used by the defendants in the design and manufacture of the Crathco dispensers.

Crathco has also used in its product the recommended improvements contained in a special report prepared for the plaintiffs by the Foster-Miller Associates. These improvements had not yet been used by the plaintiffs at the time that the four individual defendants left the employ of the plaintiffs. The Foster-Miller report had been made in only two copies, one of which was retained by Foster-Miller and the second given to Jacobs, who, in turn, gave the report to Armstrong to read and study. Although Armstrong did not take the report with him when he left the plaintiffs, he had full knowledge and memory of the details of the report. The master found that Armstrong's knowledge of the contents of the Foster-Miller report

brought about the development of certain features of the Crathco dispenser about three months sooner than they would have been developed without the knowledge contained in that report.

4. On September 19, 1969, the judge entered an interlocutory decree (first interlocutory decree) which confirmed the master's report and recommitted the matter to the master for the assessment of damages, against the defendant corporation and the defendants Crampton, Thomson and Armstrong, as to the wrongful use of the trade secrets in the Foster-Miller report. The bill was ordered to be dismissed as against the defendant Landfield. On November 3, 1970, the judge, upon motion of the defendants which made specific reference to the case of *J. T. Healy & Son, Inc.* v. *James A. Murphy & Son, Inc.* 357 Mass. 728, entered another interlocutory decree (the second interlocutory decree) which terminated the hearing before the master, and ordered that a final decree should enter which dismissed the bill as to all remaining defendants. Such a final decree was later entered.

We conclude that the first interlocutory decree was correct, and that the second interlocutory decree was in error. As to all information, except the Foster-Miller report, the master's findings disclose no proper and reasonable steps taken by the plaintiffs to protect the secrecy of the knowledge. There was no finding that any of this information, except the contents of the Foster-Miller report, was by nature capable of being kept secret or that the knowledge was in fact confined to any restricted group of employees. There was no finding of appropriate precautions by the plaintiffs even as to contemplated improvements, except those improvements included in the Foster-Miller report.

The recommendations in the Foster-Miller report are shown to be of an appropriate nature to qualify them as trade secrets. This is particularly evident in the master's finding concerning the time that would be saved by the availability of the report to an engineer engaged in

research.   It is also shown that Foster-Miller was hired by the plaintiffs for the specific purpose of recommending improvements in the dispensers.   The actions of the plaintiffs in procuring only one copy of the Foster-Miller report, and in Jacobs' personally giving it to Armstrong to read, clearly constituted sufficient and appropriate precautions to keep the report secret.   Contrary to the defendants' argument, in these circumstances there was no necessity for the plaintiffs to give to Armstrong the periodic warnings and constant admonitions of secrecy as detailed in the *Healy* case, *supra.*

5. The joint involvement of the corporate defendant and the defendants Crampton, Thomson and Armstrong in utilizing the secrets of the Foster-Miller report, and their mutual enjoyment of the benefits of those secrets as stockholders, officers and directors of Crathco, require that the damages, if any, shall be assessed against all of them.   See *Wireless Specialty Apparatus Co.* v. *Mica Condenser Co. Ltd.* 239 Mass. 158; *Junker* v. *Plummer,* 320 Mass. 76; *New England Overall Co. Inc.* v. *Woltmann,* 343 Mass. 69.   The plaintiffs have presented no argument as to the dismissal of the bill as to Landfield, and we treat that aspect of their appeal as waived.

6. There is nothing before us to show that the defendants have procured patents upon the Crathco dispenser, or upon the features recommended by the Foster-Miller report.   The master made no finding as to patents.  Therefore, we do not reach consideration of the argument in the defendants' brief that patents constitute a defence in this case.

7. The record before us is insufficient to establish any error, as claimed by the defendants, in the admission and exclusion of certain evidence by the master, or in the judge's related rulings thereafter.   There was no error in the judge's denial of the plaintiffs' motion to recommit the master's report for further findings, since the motion was not in form or substance appropriate for allowance.   See Rules 46 and 90 of the Superior Court (1954).   The judge made no express ruling as to the

degree of laches, which the defendants had pleaded, but his recommittal of the matter to the master for assessment of damages was an implied ruling that the plaintiffs are not barred by laches. We conclude that this ruling was correct.

8. The first interlocutory decree is modified by striking therefrom the provision recommitting the matter to the master. As so modified, the first interlocutory decree is affirmed. The second interlocutory decree and the final decree are reversed. Damages are to be determined by the judge or, in the judge's discretion, by a master for the wrongful use of the information contained in the Foster-Miller report, against the defendants Crathco, Inc., Crampton, Thomson and Armstrong. In due course a final decree shall be entered in accordance with the damages as assessed, if any. The plaintiffs are to have costs of appeal.

*So ordered.*