**ILLUMINATIONS, INC., Plaintiff**
v.
**WALDOROTH LABEL CORP., et al.**
**Defendants**

**No. 80-2100-S**

United States District Court
Commonwealth of Massachusetts

**July 2, 1981**

---

**Saul Shapiro,** counsel for plaintiff
**Paul Manoff,** counsel for plaintiff
**Kenneth Ingber,** counsel for defendant
**Norman Shack,** counsel for defendant

### PRELIMINARY INJUNCTION

**SKINNER, D.J.** This action came on to be heard on the plaintiff's motion for preliminary injunction, and after hearing and consideration of the parties' briefs, it is hereby ADJUDGED, ORDERED and DECREED the defendant Waldoroth Label Corp. be, and it hereby is enjoined from producing cardboard backers for transparent plastic decals which are similar to backers which it formerly manufactured for the plaintiff with respect to size, shape, placement of the decal, color combination and script, until further order of the court.

**Walter Jay Skinner**
**United States District Judge**

### ORDER ON MOTION FOR
### PRELIMINARY INJUNCTION

**SKINNER, D.J.** In this action the plaintiff alleges that the defendants have wrongfully appropriated its secret process for manufacturing transparent adhesive decals, and are also marketing them in a manner which creates confusion with the plaintiff's product in violation of the Lanham Act, in particular, 15 U.S.C. sec. 1125. This Court has jurisdiction of the statutory claim; the claim for wrongful appropriation of a trade secret is within the pendent jurisdiction of the Court.

### FINDINGS OF FACT—
### TRADE SECRET

In the spring of 1973, John Bush, the founder and president of the plaintiff corporation, conceived the idea of a transparent decal which would give the effect of stained glass when affixed to a window with the light source behind it. He was looking for the effect of "an image hanging in the air." He had some background as a designer and had done silk-screening on a hand press. He has no training in commercial silkscreening or the use of semi-automatic or automatic commercial silkscreen presses.

For about two years he experimented with different inks and substrates to achieve the precise effect that he desired. His criteria included brilliant color, accurate color registration and resistance to prolonged exposure to sunlight. One common decal material, clear vinyl sheeting, proved to be dimensionally unstable, which affects the accuracy of color registration. A clear polyester substrate, Mylar, is stable but would not accept Mr. Bush's preferred ink, which was a vinyl ink. The transparent inks compatible with Mylar did not satisfy Mr. Bush's criteria as to color clarity and resistance to sun fading. After some inquiry, Mr. Bush discovered the existence of vinyl coated Mylar, upon which he could imprint his preferred vinyl ink.

While it took Mr. Bush some time to discover the vinyl coated Mylar, this is a common material used for decals, and is commonly carried in stock by commercial silkscreen printers. The ink is also commercially available and is described in

the manufacturer's catalog as suitable for use on vinyl-coated surfaces.

Bush started producing decals in the basement of his house, using a hand-operated silkscreen press. He produced various mandalas, rose-window designs and other decorative designs. Sometime prior to 1978 he started producing a semicircular rainbow design. The rainbow soon became very popular, and Bush was unable to meet the demand with his hand press. He secured a contract with a commercial silkscreen printer to produce rainbows, but even the commercial printer could not keep up with the demand. Bush, by this time having formed the plaintiff corporation, then sought another printer as a second source of rainbows for his company. This search brought him to defendant Waldoroth Label Corporation (Waldoroth), a leading specialty printer.

In discussing the rainbow order with Waldoroth's salesman, Bush said that he considered his combination of ink and substrate to be a secret process, and expected that Waldoroth would not use the same materials for his competitors. He also said that he expected his rejects to be destroyed and not to be sold on the open market in competition with his product. He made the same representation to Mr. Dennis Prifti, Waldoroth's production manager. Mr. Prifti said that he did not have authority to make such a representation and suggested that Mr. Bush discuss the matter with someone in authority. Mr. Bush did not pursue the matter with anyone else at Waldoroth at that time.

Mr. Bush also testified that he told the production people at Waldoroth how to thin the ink for proper viscosity, the amount of drying agent to use, the proper mesh of the screen and the distance of the screen from the bed of the press. He claims that this information was also part of his trade secrets. I find, however, that Mr. Bush is not an expert in the operation of an automatic or semi-automatic press,

that there are adjustments that an experienced pressman routinely makes with respect to any new work. I find that on any new work, some period of experimentation has to be done to adjust all of the factors which affect the finished product, including the weather. I further find that the relatively good results eventually achieved by Waldoroth's pressmen did not depend on these specific directions from Mr. Bush. I find that these specifications did not constitute a protectable trade secret or a part of a protectable trade secret.

Bush also insisted that the runs of rainbows be tested for color not only with the white protective backing on them, but as a transparency against a light source. This is a fussier type of quality control than would be employed for the ordinary decal, but in view of the stated end use of the product it does not appear to constitute a trade secret.

In any case, Waldoroth's silkscreen pressmen were not as skilled as they might have been. About 70% of the first large run of rainbows was rejected by Bush. Bush refused to pay for the rejects. Mr. Heleno, Waldoroth's marketing manager, called on Bush to collect the bill. Payment was negotiated and at this time Mr. Heleno assured Bush that the rejects would be destroyed.

Later on, however, subsequent rejects were placed in Waldoroth's sample room, and eventually sold to Art Beroff, who distributed them in New York.

In 1979, Waldoroth was approached by Mr. Monte Gross, who had a cat design which he wished to have produced as a transparent decal. The cat was to be striped in the colors of the natural spectrum. Gross did not specify inks or substrate, but wanted the colors to be like the rainbow produced by Waldoroth for the plaintiff. Waldoroth proceeded to produce the Rainbow Cat, using the inks specified by Bush on 2 mil. coated mylar.

Waldoroth is also under contract to produce some more complex transparent

decals for another customer which will be competitive with some of plaintiff's other decorative designs. I find that it is likely that Waldoroth will find it convenient to use the same combination of ink and substrate to produce these decals.

The question is whether the combination of the specific ink and topcoated Mylar to achieve the precise effect sought by Mr. Bush constitutes a trade secret. It is not possible to tell what substances were used by mere inspection of the product, or by any other reasonably practical means. Waldoroth's current silkscreen expert, Mr. McDowell, testified that duplicating the same effect was no problem for an expert pressman and could be achieved with several combinations of products. Mr. Bush testified that in his opinion the methods would produce a closely similar product, but would not have the precise qualities which he claims gives his product a competitive edge in the market place. This testimony was not persuasively challenged by the defendants' witnesses.

It further appears that the silkscreen experts called by the defendants would not have been likely to hit upon the plaintiff's special combination at the outset, nor does it appear that anyone has used this combination before to produce the precise effect which Bush claims for his product. There was testimony that it would take up to six months of trial and error to hit upon the right combination.

## RULINGS OF LAW—TRADE SECRET

This branch of the case is before me under the court's pendent jurisdiction, and accordingly the law of Massachusetts applies. The general criteria for determining the existence of a trade secret are set out in **Jet Spray Cooler v. Crampton,** 361 Mass. 835, 282 N.E.2d 921, 925 (1972). It would appear that a unique adaptation of products already on the general market and used in the trade constitutes a trade secret. **Atlantic Wool Combing Co. v. Norfolk Mills, Inc.,** 357 F.2d 866 (1st Cir. 1966). This criterion of a trade secret is met by plaintiff's process.

Plaintiff must also establish that it has taken reasonable steps to insure the secrecy of its process. **Jet Spray Cooler v. Crampton, supra; USM Corp. v. Marson Fastener Corp.,** 79 Mass. Adv. Sh. 2315, 393 N.E.2d 895, 900 (1979). This issue has not been fully developed by the parties to date. It is arguable that Mr. Bush should have secured a written commitment to secrecy from one of the defendant's corporate executives, particularly in view of Mr. Prifti's disclaimer of authority. In view of my resolution of the claim for injunctive relief, I shall assume for present purposes that Mr. Bush took adequate steps to preserve the plaintiff's right to secrecy.

Where the alleged trade secret is a combination of products used in the trade which a printer might hit upon fortuitously, simply by virtue of having them in stock, and in any case could have worked out by trial and error in six months, the plaintiff is not entitled to perpetual protection. In **Winston Research Corp. v. Minnesota Min. & Mfg. Co.,** 350 F.2d 134, 142 (9th Cir. 1965), the Court approved a district court determination that the appropriate time for an injunction to run would be the time after disclosure to the defendant that it would take a legitimate competitor to develop a process which would exactly duplicate the plaintiff's product. This appears to me to be a sound approach to the present situation.

According to the evidence, this period would be six months, treating the evidence most favorably for the plaintiff. This period is long past. Accordingly, a preliminary injunction against the use by the defendants of the plaintiff's choice of ink or topcoated Mylar would be inappropriate, and the motion for such an order is DENIED.

## FINDINGS OF FACT—
## LANHAM ACT
## 15 U.S.C. SEC. 1125(a)

The plaintiff's transparent rainbow

decal is marketed on a cardboard backer of distinctive size and shape. The decal is mounted on a white rectangle which is part of a larger dark blue rectangle. The product name is given in bold letters in a distinctive script.

Defendants have produced cardboard backers for Art Beroff and Monte Gross which are of the same shape and size as the plaintiff's. The white rectangle is the same shape and size as the plaintiff's and identically located on the larger card. The product name appears in the same distinctive script. Originally, the background color of the card was the same dark blue as the plaintiff's, but lately the defendants have used a lighter blue and black.

Even with the change in color, however, the cards are confusing. In reviewing the large number of exhibits presented during the trial, I often had to find and read the name of the producer to be sure which card was the plaintiff's and which was produced by a competitor.

I find that the plaintiff was the original producer of the transparent rainbow decal, and decorative transparent decals generally, and remains a dominant producer on the market. I find that it has an aggressive national and international marketing program in which visual displays play an important part. I further find that the distinctive size, shape, color relationship and script of the plaintiff's backer is associated with plaintiff's product.

## RULINGS OF LAW—LANHAM ACT, 15 U.S.C. SEC. 1125(a)

On the basis of the foregoing, I rule that the plaintiff is likely to prevail on the merits in establishing that the defendants have appropriated plaintiff's "trade dress" for the purpose of producing it for plaintiff's competitors in violation of sec. 43(a) of the Lanham Act, 15 U.S.C. sec. 1125(a). **Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.**, 567 F.2d 154, 160 (1st Cir. 1977); **Miller Brewing Co. v. Falstaff Brewing Corp.**, 503 F. Supp. 896, 905 (D.R.I. 1980); **Menley & James Laboratories, Ltd. v. Approved Pharmaceutical Corp.**, 438 F.Supp. 1061 (N.D. N.Y. 1977).

### ORDER

Accordingly, the motion for a preliminary injunction is ALLOWED in part, and the defendant Waldoroth shall be preliminarily enjoined from producing backers for plaintiff's competitors which are similar to plaintiff's backers in size, shape, and relationship of white to dark color and lettering style. The motion is otherwise DENIED.

**Walter Jay Skinner**
**United States District Judge**