Grand Circle, LLC v. Rand, No. S0389-05 CnC  (Norton, J., May 3, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                                SUPERIOR COURT
Chittenden County, ss.:                                  Docket No. S0389-05 CnC

GRAND CIRCLE LLC, d/b/a VBT
BICYCLING VACATIONS

v.

SUSAN RAND and SOJOURN ACTIVE
VACATIONS, INC.

ENTRY

This matter came to the court in an April 26, 2005 merits hearing regarding a preliminary injunction motion. The plaintiff, VBT Bicycling Vacations, has sued the defendants, Susan Rand and Sojourn Active Vacations, for misappropriation of trade secrets, 9 V.S.A. §§ 4601–4609; breach of fiduciary duty; tortious interference with business relations; breach of loyalty; and unfair competition. VBT seeks an order enjoining the defendants from further use of its customer lists and from operating any vacation tours with prior VBT customers for three years.

VBT is engaged in coordinating bicycle tours to destinations in North America, Europe, New Zealand, and Hawaii. It hired Rand for about 10 weeks starting in December 2000 as a program manager and then again in August 2001 as a manager of "leaders," the individuals actually guiding tour groups at VBT's destinations. In this capacity, she was responsible for hiring, training, overseeing, and scheduling leader activity with respect to the bicycle tours.

In April 2004, VBT discontinued offering tours in the continental United States,

focusing instead on the European market. Shortly after, Rand began working with former U.S. leaders to organize a separate company, offering the same or similar tour packages that VBT had offered. According to Rand, she discussed her activities with VBT President Gregg Martson and requested to switch to a part-time basis with VBT so that she could redirect some of her efforts. Marston denied her request, saying that he needed her as a full-time employee.

Rand continued, nonetheless, to work with leaders outside of her work with VBT. Her activities included setting up a web site and incorporating Sojourn in late November or early December of 2004. With the assistance of the leaders, she began compiling a list of about 3,700 potential customers from various sources. These sources included the internet, from which they obtained about 2000 contacts, as well as from vendors, such as inns and motels, which supplied about 800 contacts. Some 900 contacts came from customer lists that VBT had distributed to leaders while organizing prior tour packages in the United States. Rand discussed some of these activities with Marston at various times in 2004, and in February 2005, Rand mentioned that leaders were compiling contacts from customer lists distributed by VBT. Marston expressed some concern, but Rand told him that she thought it was OK. VBT had been using customer data on its computer system (which generated the printed lists that VBT distributed to leaders) in its marketing efforts for the European trips.

In March, Marston informed Rand that VBT planned to reintroduce tours in Vermont and California beginning in September. Marston stated that one of his motivations in reintroducing the tours was so that he could eventually acquire VBT from its parent company, Grand Circle, LLC. Marston and Rand discussed the possibility of dissolving Sojourn and rolling it into VBT, but Rand was reluctant to do so until Marston had full control over VBT.

On April 1, Marston confronted Rand over a Sojourn brochure that had arrived at VBT's office in Bristol, Vermont. Because VBT did not mail advertising materials to Canada, the addresses of Canadian customers defaulted to the Bristol office address. Marston therefore suspected that Rand had acquired the contact from VBT's computerized data, which was a violation of company policy.

Rand, however, denies ever having accessed VBT's computer files, which include VBT-specific customer information and a more extensive customer database maintained

by Grand Circle. Instead, she claims that Sojourn obtained the contact address on the brochure in question from a printed customer list sent to a leader. Unlike the computer files, which were guarded by passwords and were confidential, Rand claims that the printed lists were distributed to leaders and were not labeled as confidential.

VBT, however, quotes a portion of its leader manual, which states: "Respecting VBT property: Any materials that VBT provides for the purpose of running a tour (including guest lists) are proprietary and are the ownership of VBT. Lists can only be used with the express permission of VBT." VBT also points out that although the 900 contacts from the VBT customer lists formed only about 25 percent of Sojourn's mass mailing, it resulted in 90 out of the 142 tours that Sojourn booked for the upcoming season, or roughly two-thirds of Sojourn's expected business. In other words, VBT suggests that the VBT lists are the cream of the crop of Sojourn's marketing efforts.

Rand states that notwithstanding the leader manual, it was never a policy between VBT and the leaders that the information on the lists be kept confidential. Lists were never labeled confidential, nor did VBT collect them back from leaders after tours.

On April 4, Rand delivered a letter of resignation, which Marston accepted on April 6. Eight days later, Marston brought this action.

Injunctive relief is an extraordinary remedy not routinely granted unless the right to relief is clear. Comm. to Save the Bishop's House v. Med. Hosp. of Vt., 136 Vt. 213, 218 (1978). Courts will issue injunctive relief only if the moving party can demonstrate immediate and irreparable harm. V.R.C.P. 65(a). Four factors determine whether there is immediate and irreparable harm: (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted, (2) the balance between this harm and the injury that granting the injunction would inflict on the defendant, (3) the probability that the plaintiff will succeed on the merits, and (4) the public interest. In re J.G. Juvenile, 160 Vt. 250, 255 n.2 (1993).

In order to satisfy the third factor, VBT must demonstrate that the customer lists distributed to leaders were in fact trade secrets. The Vermont statute defines trade secrets as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being

3

readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

9 V.S.A. § 4601(3). The Vermont Supreme Court has recognized that a customer list can be a trade secret, noting that "a list of people who have already purchased a product is substantially more valuable than a list of people who might only be interested in purchasing." Dicks v. Jensen, 172 Vt. 43, 47 (2001) (citing Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1333 (9th Cir. 1980)).

But in determining whether a particular customer list meets the first prong of the statutory definition (i.e., whether the list has independent economic value and is not known or readily ascertainable to another person who can obtain such economic value from it), "'no general and invariable rule can be laid down,' but rather [courts] must look to the conduct of each party and the particular information at issue." Id. at 49 (quoting Jet Spray Cooler, Inc. v. Crampton, 282 N.E.2d 921, 925 (Mass. 1972)). Given the apparent success that Sojourn has had by using the lists, with two-thirds of its bookings derived from these contacts, VBT is correct in arguing that the lists have independent economic value. These customers are obviously more predisposed to biking than those contacts from other sources, such as former guests at motels and inns or those who register on Sojourn's website. Therefore, they are not readily ascertainable through other means.

Nevertheless, it is a much closer question whether VBT made reasonable efforts to maintain the secrecy of the lists. VBT argues that using data from these printed lists is effectively the same as using data from computerized lists. The former is derived from the latter, and both are a misappropriation of trade secrets. As the Supreme Court has noted, however, "[i]t would be anomalous for the courts to prohibit the use of information that the rightful owner did not undertake to protect." Dicks, 172 Vt. at 50. "Thus, the burden is on the plaintiff to demonstrate that he 'pursued an active course of conduct designed to inform his employees that such secrets and information were to remain confidential.'" Id. (quoting Jet Spray Cooler, 282 N.E.2d at 925). The Court has cited several factors that are helpful in determining whether a party made reasonable efforts to maintain secrecy, including requiring convenants not to compete, confining knowledge to a restricted group of employees, and guarding access to the information. Id.

VBT informed the leaders that the lists were "proprietary," but this term does not necessarily connote that they were "confidential." See Black's Law Dictionary 1256 (8th

4

ed. 2004) (defining proprietary as of or relating to proprietor or property); see also Hammock by Hammock v. Hoffman-LaRoche, Inc., 662 A.2d 546, 560 (N.J. 1995) (noting in public access case that "[d]ocuments that are proprietary must be found compelling in their secrecy interests to overcome presumption of public access").

On the other hand, given that she was in charge of managing the leaders, Rand would have been responsible for informing them of the importance of keeping the information on the lists secret. She testified, however, that she never informed leaders of the confidential nature of the lists, nor did VBT ever impress upon her the importance of keeping the lists confidential. The printed customer lists were freely distributed to leaders, and they were encouraged to keep in touch with the former customers to promote future business with VBT. The customers themselves also received the lists so that they could contact each other and share their experiences on the trip. VBT never labeled the lists confidential. The leaders were generally required nor encouraged to hand back copies of the lists with corrections to the addresses, but they were not required to hand back all copies in their possession. Thus, little to no evidence suggests that VBT closely guarded the information on the lists, and VBT presents no evidence that the lists were restricted to a particular group of employees.

VBT included a "Non-Competition Agreement" in its leaders manual, but this merely stated that "it is understood that [leaders] will not enter into any employment or advisory position with any person or company offering cycling vacations during the term of [their] employment." The manual did not address leader activities after the leaders' employment. Sojourn compiled the list information after VBT had announced that it was cancelling tours in the continental United States. This agreement does not therefore provide great support that VBT was concerned over the future use of their printed customer lists.

In short, VBT made little to no efforts—beyond labeling them proprietary—to keep the lists secret. This case is therefore akin to Dicks, where the Court ultimately held that the employer had failed to show reasonable efforts to maintain customer list secrecy. 172 Vt. 50; see also Bacon v. Volvo Serv. Ctr., Inc., 597 S.E.2d 440, 443–44 (Ga. Ct. App. 2004) (holding customer list not trade secret where employer took no precautions to maintain its confidentiality); Starlight Limousine Serv., Inc. v. Cucinella, 275 A.D.2d 704, 705, 713 N.Y.S.2d 195, 196 (N.Y. App. Div. 2000) (holding no misappropriation of customer list by former employees where employer failed to take measures to guard

5

secrecy of list or prevent use of list after employees left employer's service); cf. A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 85, 89 (2d Cir. 1991) (reversing misappropriation of trade secrets summary judgment order in favor of former employee, where employee had used printed customer lists for tours but lists were labeled "STRICTLY CONFIDENTIAL," employee was informed of their limited use for pre-registering tour members, and employer otherwise took efforts to ensure lists were not further disseminated). Therefore, VBT has failed to meet its burden on a preliminary injunction motion to show that there is a reasonable probability of success on the merits in its misappropriation of trade secrets claim.

VBT also argues that it has a substantial likelihood of success on the merits of its other claims, including breach of fiduciary duty, tortious interference with a business relationship, breach of loyalty, and unfair competition. The Vermont Trade Secrets Act "displaces conflicting tort, restitutionary, and any other law of this state providing civil remedies for misappropriation of a trade secret." 9 V.S.A. § 4607(a); Omega Optical, Inc. v. Chroma Tech. Corp., 174 Vt. 10, 17–18 (2002). The statute does not, however, displace civil remedies "not based upon misappropriation of a trade secret." 9 V.S.A. § 4607(a)(2). Therefore, in order to show a substantial likelihood of success with its additional claims in this case, VBT must show that these claims are based on something other than misappropriating trade secrets.

With respect to the breach of fiduciary duty claim, VBT bases this claim solely on Rand's use of confidential and proprietary customer lists. The claim is thus re-phrasing a misappropriation of trade secrets claim, and VBT has no likelihood of success.

Similarly, the unfair competition claim is solely premised on Rand's use of confidential customer lists. Such activity did give rise to a common law action for unfair competition, see Omega Optical, 174 Vt. at 13; Restatement (Third) of Unfair Competition §§ 40, 42 (1995), but it has been displaced by the Trade Secrets Act. VBT has no likelihood of success on this claim.

The breach of loyalty claim is premised on both Rand's use of the customer lists and her operation of a competing venture. With respect to the use of the customer list, this claim is displaced by the misappropriation of trade secrets claim, and VBT has no likelihood of success. With regard to the operation of a competing venture, VBT has presented evidence in support of their claim in that Rand was actively soliciting VBT

6

customers while still employed at VBT. This may give rise to a colorable claim, regardless of Rand's use of trade secrets. Even if VBT was no longer operating in same market as Sojourn, Rand's activities would likely reduce VBT's customer base if it sold bicycling packages to them. If a potential customer decided to take a bicycling trip in Vermont, for example, that customer would be far less inclined to take a trip in Italy during the same year.

Nevertheless, there is a maxim that "equity helps the vigilant, not the dormant," which is "designed to promote diligence on the part of suitors, discourage laches and prevent the enforcement of stale demands." Philbrick v. Johnson, 91 Vt. 270, 276 (1917). In order to establish a laches defense, a defendant must demonstrate that the opposing party's delayed exercise of rights worked to the defendant's disadvantage. Stamato v. Quazzo, 139 Vt. 155, 157 (1980). "Prejudice resulting from the delay may be actual or implied." Petition of Vt. Electric Cooperative, Inc., 165 Vt. 634, 635 (1994) (mem.).

Here, Rand discussed her activities with Marston on several occasions in 2004 and 2005, and Marston expressed no concern over her assisting in starting up Sojourn. In fact, Marston agreed at one point to rent equipment to Sojourn. Rand likely relied on Marston's acquiescence and assistance to continue her work with Sojourn. Marston cannot therefore now claim that Rand's activities constituted a breach of loyalty by operating a competing venture.

Finally, VBT has a separate, cognizable claim for tortious interference with business relationships, at least to the extent that Rand and Sojourn wooed customers away from VBT. But VBT lacks a substantial likelihood of success. Again, VBT arguably acquiesced to Sojourn's activities when Marston failed to take any action to prevent Rand from assisting Sojourn. Therefore, the doctrine of laches may defeat VBT's claim.

Furthermore, VBT does not present enough evidence to meet the merits of its tortious interference with business relationships claim. This claim requires intentional and improper interference with another's prospective contractual relations. Restatement of Torts § 766B (1979). With respect to the intent element, courts consider whether the actor desired the interference or if she knew that the interference was certain or substantially certain to occur. Id. § 766B, cmt. d; Gifford v. Sun Data, Inc., 165 Vt. 611, 612 (1996) (mem.).

7

Here, there is an open question as to whether Rand had the requisite intent. Although it is possible that the customers Sojourn solicited would be less likely to book with VBT's European tour packages after booking with Sojourn's U.S. tour packages, Rand argues that the European packages were completely different products and most customers would not choose between one or the other. Therefore, Rand might not have known that she was interfering with VBT's prospective business. Moreover, the fact that Marston encouraged her efforts suggests that Rand had no reason to know Sojourn would interfere with VBT's prospective business.

In determining whether action is "improper" in a tortious interference claim, courts consider the actor's conduct, the actor's motive, the interest of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of the actor, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties. Restatement (Second) of Torts § 767; Gifford, 165 Vt. at 612 n.1 (1996) (mem.).

VBT fails to present sufficient evidence to show that Rand's conduct meets any of these factors. No evidence shows that Rand's motives were improper. The fact that Marston and Rand discussed the possibility of merging VBT and Sojourn suggests that their interests and their relationship were not devious or underhanded. Rather, they were merely searching for the best business arrangement. And VBT's speculative theory that Sojourn was taking away prospective customers for European packages by selling U.S. tour packages does not demonstrate that Sojourn's activities proximately caused a loss of business for VBT.

In sum, VBT has failed to demonstrate that it has a substantial likelihood of success with its tortious interference with business relationships based on Rand's activities in competition with VBT.

ORDER

For the foregoing reasons, VBT's preliminary injunction motion is DENIED.

Dated at Burlington, Vermont, May 3, 2005.

8

_____/s/_____
Richard W. Norton, Presiding Judge