Fremont-Smith, Thayer, J.
On January 28,2004, the plaintiffs RIS Paper Company (“RIS”) and XPEDX (collectively, “plaintiffs”), commenced this action against the defendants Wave Graphics, Inc. (“Wave Graphics”) and Edward J. DeStefano, Jr. (“DeStefano”) alleging misappropriation of Wave Graphics’ proprietary customer information and fraudulent conveyance of same to DeStefano’s new employer, Unigraphics, Inc. Judgment was entered in favor of RIS Paper Company against Wave Graphics for the sum of $97,930.06, and in favor of XPEDX against Wave Graphics for the sum of $29,263.55.[1] A jury-waived trial was held before this Court on September 18,2006 as to the remaining claims against DeStefano.[2]
In 1989, DeStefano incorporated a small commercial printing business under the name of Wholesale Graphics, Inc., which, in 2000, changed its corporate name to Wave Graphics, Inc.
During 1999, in response to a then-strong demand for commercial printing services, Wave Graphics undertook a two million dollar expansion of its plant and equipment. In 2000, business fell off due to the dot-com market collapse and to the events of 9/11. As the company was losing money, DeStefano loaned Wave Graphics approximately $200,000 of his own funds. Nevertheless, by December 2003, Wave Graphics was insolvent.
After conferring with financial consultants, it was decided in December 2003 to wind-down and close the business. At that time, Wave Graphics made payments on account to both RIS Paper Company and XPEDX, from which it had purchased paper product continuously for several decades. On or about January 13, 2004 Wave Graphics filed an Assignment for the Benefit of Creditors (G.L.c. 203, §40, et seq.), evidencing, inter alia, liabilities of $3,000,000 of secured debt, approximately $32,000 of prioriiy tax obligations to IRS and DOR and $400,000 of unsecured debt. The claims of both of the plaintiffs here were included in the stated “unsecured debt.”
On March 16, 2004, a publicly advertised “Assignee’s Public Auction Sale” of all of the assets of Wave Graphics was held by Joseph Finn Co., Inc. Bids were received for all of the various assets of Wave Graphics from approximately eighiy-eight of those who were in attendance. Wave Graphics’ right, title and interest in its name, goodwill, customer lists and telephone numbers was auctioned to Unigraphics, Inc. for the sum of $100.[3]
In December 2003, following the decision to close down Wave Graphics, DeStefano began discussions with two local commercial printing companies, Kirkwood and Unigraphics, Inc. with a view to securing employment for himself and for any interested Wave Graphics salesmen. After Unigraphics made an employment proposal, he and seven of Wave Graphics’ salesmen élected to accept employment with Unigraphics.
DeStefano’s employment arrangement with Uni-graphics is set forth in their Employment Agreement dated January 13, 2004, the specific terms and conditions of which were negotiated and prepared primarily by counsel for the respective parties.
Pursuant to the Employment Agreement, DeStefano was to receive the following compensation:
a. Base Salary of $115,000 per annum, (915(a));
b. Commission on net sales on “New Accounts”[4] based upon the following table:
Annual Net Sales Commission Percentage
To New Accounts 2004 2005 2006
Up to $3,000,000 5% 2% 2%
In Excess of 4% 4% 4%
$3,000,000
c. An additional $60,000 bonus payment if New Accounts exceeded $2,000,000 in the calendar year 2004 (15(d)).
d. An additional $50,000 bonus payment if New Accounts exceeded $2,000,000 in the calendar year 2005 (915(d));
In addition, the Employment Agreement provided that DeStefano was to receive an advance against his commissions in the amount of $100,000, payable $50,000 at the time of the Agreement’s execution and $50,000 thirty days thereafter. (¶5.) DeStefano was actually *450 paid his salary of $115,000 (partly in advance), commissions of $100,000, and a bonus of $60,000, or a total of $275,000 before he was terminated by Uni-graphics in 2004.
Wave Graphics and DeStefano having not entered into any “covenant not to compete,” it is not disputed that DeStefano had every right to seek and obtain employment by Unigraphics and to receive his salary of $115,000. What plaintiffs do dispute is his receipt of $100,000 in commissions under para. 5(b) of the Agreement and of a “performance bonus” of $60,000 under para. 5(d) of the Employment Agreement, which plaintiffs assert were really payments for DeStefano’s misappropriation and fraudulent transfer of Wave Graphics’ customer list to Unigraphics. The crucial question to be determined in this case is whether the information sought to be protected is, in fact and in law, “confidential,” which is to be determined based on the conduct of the parties and the nature of the information. In making this determination a court is to look to:
(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which information could be properly acquired or duplicated by others.
Jet Spray Cooler, Inc. v. Cramton, 361 Mass. 835, 840 (1979); J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728 (1970).
The Court in Jet Spray noted that, as here, “no list or paper was taken” (id.) and concluded that “mailing lists of plaintiffs customers, financial and sales lists of a most comprehensive kind, and lists of all supplies to the plaintiffs, including the nature of plaintiffs purchases and the prices paid,” were not proprietary information because no steps or admonitions as to their secrecy had been taken or made. Id., at 842. As also noted in Jet Spray, supra at 841: “One seeking to prevent the disclosure or use of trade secrets or information must demonstrate that he pursued [an] active course of conduct designed to inform his employees that such secrets and information were to remain confidential.”
Similarly in J.T. Healy, supra, the Court noted that the defendants had taken no “record cards, price cards, or customer lists,” and that defendants “had a right to use their general knowledge, experience, memory, and skill” in order to compete with their former employer. Id. at 740. To that end, the employer must “exercise eternal vigilance,” and the employees must be “constantly admonished” that information is confidential and must be kept so. Id. at 738.
Applying these tests to the situation here, although there was information regarding each customer on Wave Graphics’ computer, there was no “customer list” as such. No employees of Wave Graphics were required to sign non-disclosure or non-compete agreements, and no documents were stamped “confidential.” There was no evidence that salesmen were ever admonished to keep customer information confidential. It was, moreover, customary for salesmen in the industry to change employment and to go with another competitor, taking their customers with them.[5] Here, when Wave Graphics went out of business, its eight to ten salesmen left, taking with them most of their Wave Graphics customers. Seven of these salesmen went with DeStefano to Unigraphics.
It is thus apparent that, in the printing industry, what is valuable is not the identity of a customer as such, but rather a salesman’s personal relationship with such a customer. The identity of Wave Graphics’ customers was thus not, in and of itself, an asset of any value. What was valuable was in the personal relationship of each salesman to his customers. This was recognized by Wave Graphics’ having taken no steps or safeguards to establish such information as being proprietary to the company.
Thus, while Unigraphics’ payment to DeStefano under the “bonus” and “commissions” provisions of his Employment Agreement and its hiring of Wave Graphics salesmen did recognize the value of their personal relationships wadi customers, it did not indicate that any of the information which Unigraphics •benefitted from, by hiring those individuals, was proprietary to Wave Graphics, rather than having been personal to the employees.
An almost identical situation was presented in a case decided by the Bankruptcy Court for the District of Massachusetts, In re: Corrugated Paper Corp., Rockman, Trustee v. Eastern Container Corp., 185 B.R. 667 (1995). There, like plaintiffs here, the trustee claimed that the bankrupt company’s customer information was a valuable asset of the company in which the debtor had a secured interest. As in this case, the plaintiff claimed that the defendant had fraudulently transferred goodwill of the company and thus committed an unfair and deceptive practice. The Court pointed out:
Usually, the prime source of goodwill, particularly the goodwill of a small business, is the relationship it has with its customers. This, in turn, often flows from the relationship particular individuals working in the business have with particular customers.
The Court noted that, in that case as here, customer patronage had been transferred because of the presence of a particular salesman so that “the salesman, not the Debtor, transferred the customer’s patronage through their employment with the defendant and their covenants not to compete.” Thus, the Court concluded, the Trustee had no right to claim the value *451 of the customer’s business as an asset of the bankrupt estate.
Plaintiffs point out that an initial draft of DeStefano’s Employment Agreement with Unigraphics had acknowledged his “customer relationships with many currently existing and active accounts,” and had gone on to provide that “[t]he parties acknowledge that the employee possesses unique and extensive proprietary information regarding the commercial printing business in Eastern Massachusetts and Southern New England,” so that Mr. DeStefano would be paid $100,000 for his “proprietary information." This language, however, was drafted by the attorneys for De-Stefano and Unigraphics and was not endorsed by DeStefano. It was, moreover, eliminated from the final Employment Agreement which DeStefano signed. It thus has no bearing on whether Wave Graphics’ customer information actually constituted proprietary information of Wave Graphics under the criteria set forth in Jet Spray, and in J.T. Healey & Sons, supra.
Based upon all of the credible evidence, the Court finds that the value of the customer information consisted in the personal relationships DeStefano and his salesmen had with their customers rather than in the identity of any customers or in any customer list. These personal relationships were not a proprietary asset of Wave Graphics, but were legally and properly acquired and utilized by Unigraphics to generate customers and sales. The Court therefore concludes that DeStefano did not misappropriate or transfer any trade secret or proprietary information of Wave Graphics to Unigraphics and hence committed no fraudulent transfer in violation of G.L.c. 109A, §5. For the same reasons, DeStefano committed no violation of any duty to the plaintiffs or to any other creditors of Wave Graphics. On the contrary, when Wave Graphics went out of business, he legally sought and procured other employment in the industry by providing Unigraphics with the benefit of the personal relationships which he, and his salesmen, enjoyed with customers in the industry. His commissions and bonuses from Uni-graphics did reflect the legitimate benefit to Unigraphics which resulted from those non-proprietary salesmen-customer relationships and from DeStefano’s elimination (by way of his covenant not to compete and non-disclosure covenant with Unigraphics) from remaining a potential competitor of Uni-graphics in the industry. The Court concludes, however, that such payments did not constitute payment for any wrongful transfer of proprietary information by DeStefano from Wave Graphics to Unigraphics.

ORDER FOR JUDGMENT

For all of the above reasons, judgment shall be entered for the defendants.

As Wave Graphics was insolvent, the judgments have remained unpaid.

For unexplained reasons, Unigraphics was not made a defendant.

As noted in the Summary of Sale of Joseph Finn Co., Inc. the ‘Total Sales” resulting from the auction of all of the assets ofWave Graphics amounted to $455,234.50, before expenses. Accordingly, most of even the secured debt remained unpaid.

“New Accounts” was defined as “accounts developed solely by the Employee and with whom the Employer is not doing business as of the date of this Agreement. . .”

The testimony was that, in such cases, it was usual for a departing salesman to take up to 80% of his customers with him to the new employer.