**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

---

No. 09-1336

TAKE IT AWAY, INC.,

Plaintiff, Appellant,

v.

THE HOME DEPOT, INC.,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock,  U.S. District Judge]

---

Before

Lipez, Circuit Judge,
Souter, Associate Justice,[*] and Howard, Circuit Judge.

---

Philip Y. Brown, with whom Timothy P. Frawley, Brian R. Birke, Adler Pollock & Sheehan P.C., and John M. Greabe were on brief, for appellant.
David B. Chaffin, with whom Sarianna T. Honkola and White and Williams LLP were on brief, for appellee.

---

April 15, 2010

---

[*]      The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, <u>Associate Justice</u>**.  Three principals organized the appellant, Take It Away, Inc., to act as a broker in a contemplated business of supplying dumpsters that do-it-yourselfers could rent from the appellee, The Home Depot, Inc., and like retailers.  In a document called a "teaser," mailed to a Home Depot official in 1997, Take It Away hopefully described itself as a "Nationwide Association" of waste haulers and others, with a "Retail Distribution Channel for renting Construction & Demolition Debris Removal Containers" (<u>i.e.</u>, dumpsters), which was prepared to form "Strategic Partnerships" with building material supplies dealers like Home Depot. Take it Away would "provid[e] all the tools," apparently dumpsters, "for [Home Depot] to capture [its] share of this immense untapped market," presumably by renting the dumpsters to its customers.  The statement described itself as confidential, and when the recipient at Home Depot agreed to have discussions he signed a "non-disclosure agreement" prepared by Take It Away, pledging that Home Depot would "utilize the Confidential Proprietary Information" to be disclosed "for the sole purpose of evaluating the business of [Take It Away] and [would] make no other use" of it without permission.

The information actually disclosed was a proposal that the association, Take It Away, would supply dumpsters (obtained, one supposes, from its associated trash haulers) that Home Depot would rent directly to its customers, pocketing ten percent of the

charge and remitting the balance to Take It Away.  Home Depot was not interested in becoming a dumpster lessor, and remained of that mind despite at least four more of Take It Away's pitches to other company officers and employees over the next five years.  Beginning in 2003, however, Home Depot signed agreements allowing four suppliers in the United States and Canada to use space in Home Depot stores to offer dumpster rentals directly as lessors to Home Depot customers.

Take It Away brought this suit in a Massachusetts state court.  Count 1 accused Home Depot of violating the non-disclosure agreement; count 2 charged appropriation of trade secrets contrary to Massachusetts General Laws Chapter 93, § 42; count 3 alleged common law conversion of trade secrets; and count 4 claimed violation of Chapter 93A, § 11 of the Massachusetts statutes, forbidding unfair trade practices.  Home Depot removed the case to federal court, where the district judge granted summary judgement to Home Depot on all counts.  On appeal for de novo review, Klaucke v. Daly, 595 F.3d 20, 24 (1st Cir. 2010), we affirm.

The principal difficulty in this case is understanding what the confidentiality agreement was supposed to protect.  "Confidential Proprietary Information" is undefined, and the district court not unnaturally took it at a fairly general level to cover "the concept of renting dumpsters from national home improvement retail centers."  At first, some of us also thought

that was what the fight was about, but a careful rereading of Take It Away's reply brief shows that its claim is a degree more particular, focused on brokerage. It says that its "dumpster-brokerage concept and business plan" were the intended subjects of protection; "the essence of its <u>concept</u> is national retail distribution dumpster brokerage" combined with a "<u>separate business plan</u> for putting its concept into practice" (emphasis in original). The stress in the reply brief is repeatedly on its "dumpster-brokerage concept" or "container-brokerage concept," which is more specific than "rental of dumpsters."

The clarification at least saves Take It Away from the obvious response that all it disclosed was that Home Depot, like ever so many others, could rent out dumpsters. But even as clarified, the claim seems to boil down to this: the agreement was intended to protect a "brokerage" concept to the effect that Take It Away would deal with third parties to obtain dumpsters that Home Depot could rent to customers. The concept is not merely, "you can do it, too," but no more than "you can do it, too, and we will broker your supplies."

With the subject of the claimed protection so understood, we think the summary judgement order was correct on all counts. Although much of the briefing and argument addresses the potential breadth of "Confidential Proprietary Information" along with its relation to the notion of a trade secret and the criteria for

-4-

concluding that information amounts to a trade secret, the anterior issue is whether the concept actually meant to be protected here can reasonably be seen as having enough value, beyond what was commonly known or obvious, to amount to consideration for Home Depot's promise to limit its use of that concept as Take It Away subsequently disclosed it. The first reason for answering no is simply that before the Home Depot official signed the agreement he had already seen the teaser, which is fairly read as disclosing the concept of a network of businesses organized by Take It Away to supply dumpsters to be rented out by retail suppliers to their customers. That is, the teaser described an association in the role of a broker of rental goods. While the details of the business plan were not set out there, the basic business structure was apparent: Home Depot would "capture" the market, while Take It Away would work behind the scene of the retailer's direct transaction with the customer. The concept was out in the open before Home Depot agreed to talk.[1]

But even if the claimed secret had not already been revealed before the agreement was signed, one searches in vain for anything of value not readily imaginable that might be protected.

---

[1] The detailed provisions of the business plan were not disclosed by the relatively short teaser statement, but this is irrelevant for two independent reasons. First, it does not appear that the plan adds anything to the concept that was not obvious from the concept as described by the teaser. And, second, Home Depot did not implement the details of Take It Away's plan; its four contractors deal directly with the customers.

-5-

It is undisputed that Home Depot rented tools and even trucks to its customers, that dumpsters were commonly rented out, and that retailers need manufacturers or suppliers. While it might have been information of some commercial (though not necessarily protectable) value that a previously unknown broker network was ready for business and could give Home Depot an immediate entree to the dumpster supply market, that could not have been protectable information here, if for no other reason than the undisputed fact that Take it Away's "Nationwide Association" did not actually exist; the references to an association were expressions of hope, nothing more. In sum, it is hard to see what concept or plan Home Depot gained from the disclosure that it could not have thought up readily for itself if it had found any reason to expand its rental activity: a dumpster is a big tool for removing debris, and renting tools and establishing reliable supply networks are not the stuff of novel concepts. This is not to say, of course, that a proposal like Take It Away's could not have led to lucrative business if accepted, but any such value would have come from efficient execution, not conceptual inventiveness, and disclosing the concept did not provide the value necessary for consideration supporting a contractual claim.

This view of the nature and worth of Take It Away's disclosure answers its argument that "Confidential Proprietary Information" may be the subject of a confidentiality agreement

covering more than trade secrets and may be protected by contract under Massachusetts law. We will assume this to be so, for it makes no difference. Whatever the state law of contract may protect, there must be a contract to protect it, and without valuable consideration on one side there is none.

As might be expected, the state doctrine of protectable trade secrets, the subject of counts 2 and 3, fails to improve Take It Away's position. Under Massachusetts common law, a trade secret is "'any formula, pattern, device or compilation of information . . . used in one's business . . . which gives him an opportunity to obtain an advantage over competitors who do not know or use it," J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970) (quoting Restatement of Torts § 757 cmt. b (1939)).[2] The definition is spacious to be sure, but a protectable secret must still be described aptly as a secret after considering six criteria, see Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972), which are not much help to Take It Away.

_____

[2] While Take It Away brought claims under both Massachusetts common law and statutory law, it does not distinguish between them on appeal because it views them as "doctrinally equivalent." This may well be true. See Incase Inc. v. Timex Corp., 488 F.3d 46, 52 n.10 (1st Cir. 2007); Burten v. Milton Bradley Co., 763 F.2d 461, 462 (1st Cir. 1985) ("Mass. Gen. Laws Ann. ch. 93, § 42 . . . essentially codifies the common law."). Regardless, because Take It Away makes no argument that its statutory claim calls for a separate analysis, we analyze counts 2 and 3 together.

The first and last criteria look to the extent that information was known outside Take It Away and the ease with which it could be acquired independently. As noted, the teaser revealed what a true teaser would have left for later, and for that matter anyone interested in domestic building construction could readily have thought of supplying dumpsters for rent by a lumber dealer; in fact, the idea struck one of Take It Away's principals in a flash as he was driving by a Home Depot store. While it should not count against a small corporation that everyone working for it knows the supposed secret (under the second criterion), it does count against Take It Away (under the third) that the move it made to protect itself (getting a non-disclosure agreement) was outflanked by the teaser and was insisted upon in dealing with only one of at least seven Home Depot officers or employees to whom Take It Away revealed the concept. The others variously refused, declined, or were never asked to sign the non-disclosure form. See Healy, 357 Mass. at 738, 260 N.E.2d at 731 (he who wishes to preserve a trade secret "must exercise eternal vigilance").

The amount of effort and money devoted to developing the supposed secret (criterion five) does not enhance Take It Away's case appreciably, for the 1700 hours of work claimed, and the thousands said to have been spent, include the extended and wholly unsuccessful marketing efforts. Finally, with respect to the fourth criterion (the value of the idea), while Take It Away's

expert envisioned millions in profits, nothing in his report suggests that a trade secret was the reason; he simply estimates the value of the business opportunity assuming vigorous marketing by Home Depot.  Cf. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1011 n.15 (1984) ("[T]he value of a trade secret lies in the competitive advantage it gives its owner over competitors.").

It is not apparent that consideration of these six factors could support a conclusion of protectable trade secret.  So summary judgement on counts 2 and 3 was proper.  See Rodi v. S. New Eng. Sch. of Law, 532 F.3d 11, 15 (1st Cir. 2008) (explaining that summary judgement is appropriate if no reasonable jury could find for the non-movant, even on an issue that is "ordinarily a question of fact for the jury" under state law).

Take It Away's final claim alleges violation of Massachusetts General Laws Chapter 93-A.  As Take It Away succinctly put it in the reply brief, this claim "is premised on a number of unfair and deceptive acts . . . namely, Home Depot's breach of the Agreement and misappropriation of trade secrets."  Absent an enforceable agreement and, specifically, a trade secret, count 4 fails as well.

**Affirmed.**